# VERMONT AGENCY OF NATURAL RESOURCES *v.*
# UNITED STATES EX REL. STEVENS

No. 98–1828.   Argued November 29, 1999—Decided May 22, 2000

766

Scalia, J., delivered the opinion of the Court, in which Rehnquist, C. J., and O'Connor, Kennedy, Thomas, and Breyer, JJ., joined. Breyer, J., filed a concurring statement, *post*, p. 788. Ginsburg, J., filed an opinion concurring in the judgment, in which Breyer, J., joined, *post*, p. 788. Stevens, J., filed a dissenting opinion, in which Souter, J., joined, *post*, p. 789.

*J. Wallace Malley, Jr.*, Deputy Attorney General of Vermont, argued the cause for petitioner. With him on the briefs were *William H. Sorrell*, Attorney General, *Bridget C. Asay, Mark J. Di Stefano*, and *Wendy Morgan*, Assistant

Attorneys General, *David M. Rocchio*, Special Assistant Attorney General, *Ronald A. Shems*, and *Carter G. Phillips*.

*Deputy Solicitor General Kneedler* argued the cause for respondent United States. With him on the briefs were *Solicitor General Waxman, Acting Assistant Attorney General Ogden, Deputy Solicitor General Underwood, Malcolm L. Stewart, Michael F. Hertz, Douglas N. Letter,* and *Michael E. Robinson.*

*Theodore B. Olson* argued the cause for respondent Stevens. With him on the briefs were *Thomas G. Hungar, Miguel A. Estrada, Stephen J. Soule, Matthew E. C. Pifer,* and *Mark G. Hall.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for the State of New York et al. by *Eliot Spitzer*, Attorney General of New York, *Preeta D. Bansal*, Solicitor General, *Peter H. Schiff*, Deputy Solicitor General, and *Howard L. Zwickel*, Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Janet Napolitano* of Arizona, *Mark Pryor* of Arkansas, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *Richard Blumenthal* of Connecticut, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Thurbert E. Baker* of Georgia, *Earl I. Anzai* of Hawaii, *Alan G. Lance* of Idaho, *James E. Ryan* of Illinois, *Jeffrey A. Modisett* of Indiana, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *J. Joseph Curran, Jr.*, of Maryland, *Jennifer M. Granholm* of Michigan, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *John J. Farmer, Jr.*, of New Jersey, *Patricia A. Madrid* of New Mexico, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Sheldon Whitehouse* of Rhode Island, *Mark Barnett* of South Dakota, *Paul G. Summers* of Tennessee, *John Cornyn* of Texas, *Jan Graham* of Utah, *Mark L. Earley* of Virginia, *Christine O. Gregoire* of Washington, *Darrell V. McGraw, Jr.*, of West Virginia, and *Gay Woodhouse* of Wyoming; for the City of New York et al. by *Leonard J. Koerner, James K. Hahn, Richard A. Devine, Patrick T. Driscoll, Jr., Thomas Burnham, Donna M. Lach, Louise H. Renne,* and *Patrick J. Mahoney;* for the Alabama Medicaid Agency et al. by *Charles A. Miller* and *Caroline M. Brown;* for the American Medical Association et al. by *Jack*

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether a private individual may bring suit in federal court on behalf of the United States against a State (or state agency) under the False Claims Act, 31 U. S. C. §§ 3729–3733.

## I

Originally enacted in 1863, the False Claims Act (FCA) is the most frequently used of a handful of extant laws creating a form of civil action known as *qui tam*.[1]  As amended, the

---

*R. Bierig, Paul E. Kalb, Michael L. Ile, Anne M. Murphy,* and *Leonard A. Nelson;* for the American Petroleum Institute by *Donald B. Craven, Clarence T. Kipps, Jr., Alan I. Horowitz,* and *Peter B. Hutt II;* for FMC Corporation by *Donald B. Ayer, Gregory G. Katsas,* and *John B. Kennedy;* for the National Governors' Association et al. by *Richard Ruda* and *James I. Crowley;* for the Orleans Parish School Board et al. by *Sam A. LeBlanc III* and *Robert Markle;* for the Regents of the University of Minnesota et al. by *Mark B. Rotenberg* and *Mark A. Bohnhorst.*

Briefs of *amici curiae* urging affirmance were filed for the National WhistleBlower Center by *Stephen M. Kohn, Michael D. Kohn,* and *David K. Colapinto;* and for Taxpayers Against Fraud by *Evan H. Caminker* and *Jonathan S. Massey.*

Briefs of *amici curiae* were filed for the Aerospace Industries Association of America, Inc., by *Charles G. Cole, Jerald S. Howe, Jr.,* and *Shannen W. Coffin;* for the American Clinical Laboratory Association by *Hope S. Foster;* for the Chamber of Commerce of the United States of America et al. by *Herbert L. Fenster, Stephen A. Bokat,* and *Robin S. Conrad;* for the Federation of American Health Systems by *Walter E. Dellinger* and *Charles R. Work;* for Friends of the Earth et al. by *James S. Chandler, Jr., Bruce J. Terris,* and *Carolyn Smith Pravlik;* for the National Employment Lawyers Association by *Frederick M. Morgan, Jr., James B. Helmer, Jr.,* and *Paula A. Brantner;* for the Project on Government Oversight by *Charles Tiefer* and *Jonathan W. Cuneo;* and for Taxpayers Against Fraud by *Evan H. Caminker* and *Vicki C. Jackson.*

[1] *Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* which means "who pursues this action on our Lord the King's behalf as well as his own."  The phrase dates from at least the time of Blackstone.  See 3 W. Blackstone, Commentaries *160.

Three other *qui tam* statutes, all also enacted over 100 years ago, remain on the books.  See 25 U. S. C. § 81 (providing cause of action and

FCA imposes civil liability upon "[a]ny person" who, *inter alia*, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U. S. C. § 3729(a). The defendant is liable for up to treble damages and a civil penalty of up to $10,000 per claim. *Ibid.* An FCA action may be commenced in one of two ways. First, the Government itself may bring a civil action against the alleged false claimant. § 3730(a). Second, as is relevant here, a private person (the relator) may bring a *qui tam* civil action "for the person and for the United States Government" against the alleged false claimant, "in the name of the Government." § 3730(b)(1).

If a relator initiates the FCA action, he must deliver a copy of the complaint, and any supporting evidence, to the Government, § 3730(b)(2), which then has 60 days to intervene in the action, §§ 3730(b)(2), (4). If it does so, it assumes primary responsibility for prosecuting the action, § 3730(c)(1), though the relator may continue to participate in the litigation and is entitled to a hearing before voluntary dismissal and to a court determination of reasonableness before settlement, § 3730(c)(2). If the Government declines to intervene within the 60-day period, the relator has the exclusive right to conduct the action, § 3730(b)(4), and the Government may subsequently intervene only on a showing of "good cause," § 3730(c)(3). The relator receives a share of any proceeds from the action—generally ranging from 15

share of recovery against a person contracting with Indians in an unlawful manner); § 201 (providing cause of action and share of recovery against a person violating Indian protection laws); 35 U. S. C. § 292(b) (providing cause of action and share of recovery against a person falsely marking patented articles); cf. 18 U. S. C. § 962 (providing for forfeiture to informer of share of vessels privately armed against friendly nations, but not expressly authorizing suit by informer); 46 U. S. C. § 723 (providing for forfeiture to informer of share of vessels removing undersea treasure from the Florida coast to foreign nations, but not expressly authorizing suit by informer).

to 25 percent if the Government intervenes (depending upon the relator's contribution to the prosecution), and from 25 to 30 percent if it does not (depending upon the court's assessment of what is reasonable)—plus attorney's fees and costs. §§ 3730(d)(1)–(2).

Respondent Jonathan Stevens brought this *qui tam* action in the United States District Court for the District of Vermont against petitioner Vermont Agency of Natural Resources, his former employer, alleging that it had submitted false claims to the Environmental Protection Agency (EPA) in connection with various federal grant programs administered by the EPA. Specifically, he claimed that petitioner had overstated the amount of time spent by its employees on the federally funded projects, thereby inducing the Government to disburse more grant money than petitioner was entitled to receive. The United States declined to intervene in the action. Petitioner then moved to dismiss, arguing that a State (or state agency) is not a "person" subject to liability under the FCA and that a *qui tam* action in federal court against a State is barred by the Eleventh Amendment. The District Court denied the motion in an unpublished order. App. to Pet. for Cert. 86–87. Petitioner then filed an interlocutory appeal,[2] and the District Court stayed proceedings pending its outcome. Respondent United States intervened in the appeal in support of respondent Stevens. A divided panel of the Second Circuit affirmed, 162 F. 3d 195 (1998), and we granted certiorari, 527 U. S. 1034 (1999).

---

[2] The denial of a motion to dismiss based on a claim of Eleventh Amendment immunity is immediately appealable. See *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.*, 506 U. S. 139 (1993). The Second Circuit exercised pendent appellate jurisdiction over the statutory question. See *Swint* v. *Chambers County Comm'n*, 514 U. S. 35, 50–51 (1995).

## II

We first address the jurisdictional question whether respondent Stevens has standing under Article III of the Constitution to maintain this suit. See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 93–102 (1998).

As we have frequently explained, a plaintiff must meet three requirements in order to establish Article III standing. See, *e. g., Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 180–181 (2000). First, he must demonstrate "injury in fact"—a harm that is both "concrete" and "actual or imminent, not conjectural or hypothetical." *Whitmore* v. *Arkansas*, 495 U. S. 149, 155 (1990) (internal quotation marks and citation omitted). Second, he must establish causation—a "fairly . . . trace[able]" connection between the alleged injury in fact and the alleged conduct of the defendant. *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26, 41 (1976). And third, he must demonstrate redressability—a "substantial likelihood" that the requested relief will remedy the alleged injury in fact. *Id.*, at 45. These requirements together constitute the "irreducible constitutional minimum" of standing, *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992), which is an "essential and unchanging part" of Article III's case-or-controversy requirement, *ibid.*, and a key factor in dividing the power of government between the courts and the two political branches, see *id.*, at 559–560.

Respondent Stevens contends that he is suing to remedy an injury in fact suffered by the United States. It is beyond doubt that the complaint asserts an injury to the United States—both the injury to its sovereignty arising from violation of its laws (which suffices to support a criminal lawsuit by the Government) and the proprietary injury resulting from the alleged fraud. But "[t]he Art. III judicial power exists only to redress or otherwise to protect against injury *to the complaining party*." *Warth* v. *Seldin*, 422 U. S. 490,

499 (1975) (emphasis added); see also *Sierra Club* v. *Morton,* 405 U. S. 727, 734–735 (1972). It would perhaps suffice to say that the relator here is simply the statutorily designated agent of the United States, *in whose name* (as the statute provides, see 31 U. S. C. § 3730(b)) the suit is brought—and that the relator's bounty is simply the fee he receives *out of the United States' recovery* for filing and/or prosecuting a successful action on behalf of the Government. This analysis is precluded, however, by the fact that the statute gives the relator himself an interest *in the lawsuit,* and not merely the right to retain a fee out of the recovery. Thus, it provides that "[a] person may bring a civil action for a violation of section 3729 *for the person and for the United States Government,*" § 3730(b) (emphasis added); gives the relator "the right to continue as a party to the action" even when the Government itself has assumed "primary responsibility" for prosecuting it, § 3730(c)(1); entitles the relator to a hearing before the Government's voluntary dismissal of the suit, § 3730(c)(2)(A); and prohibits the Government from settling the suit over the relator's objection without a judicial determination of "fair[ness], adequa[cy] and reasonable[ness]," § 3730(c)(2)(B). For the portion of the recovery retained by the relator, therefore, some explanation of standing other than agency for the Government must be identified.

There is no doubt, of course, that as to this portion of the recovery—the bounty he will receive if the suit is successful—a *qui tam* relator has a "concrete private interest in the outcome of [the] suit." *Lujan, supra,* at 573. But the same might be said of someone who has placed a wager upon the outcome. An interest unrelated to injury in fact is insufficient to give a plaintiff standing. See *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S. 464, 486 (1982); *Sierra Club, supra,* at 734–735. The interest must consist of obtaining compensation for, or preventing, the violation of a legally pro-

tected right.  See *Lujan, supra,* at 560–561.  A *qui tam* re-
lator has suffered no such invasion—indeed, the "right" he
seeks to vindicate does not even fully materialize until the
litigation is completed and the relator prevails.[3]  This is not
to suggest that Congress cannot define new legal rights,
which in turn will confer standing to vindicate an injury
caused to the claimant.  See *Warth, supra,* at 500.  As we
have held in another context, however, an interest that is
merely a "byproduct" of the suit itself cannot give rise to a
cognizable injury in fact for Article III standing purposes.
See *Steel Co., supra,* at 107 ("[A] plaintiff cannot achieve
standing to litigate a substantive issue by bringing suit for
the cost of bringing suit"); see also *Diamond* v. *Charles,* 476
U. S. 54, 69–71 (1986) (holding that assessment of attorney's
fees against a party does not confer standing to pursue the
action on appeal).

We believe, however, that adequate basis for the relator's
suit for his bounty is to be found in the doctrine that the
assignee of a claim has standing to assert the injury in fact
suffered by the assignor.  The FCA can reasonably be re-
garded as effecting a partial assignment of the Govern-
ment's damages claim.[4]  Although we have never expressly
recognized "representational standing" on the part of as-
signees, we have routinely entertained their suits, see, *e. g.,*

---

[3] Blackstone noted, with regard to English *qui tam* actions, that "no
particular person, A or B, has any right, claim or demand, in or upon
[the bounty], till after action brought," and that the bounty constituted an
"inchoate imperfect degree of property . . . [which] is not consummated
till judgment."  2 W. Blackstone, Commentaries *437.

[4] In addressing the Eleventh Amendment issue that we leave open
today, the dissent suggests that we are asserting that a *qui tam* relator
"is, in effect, suing as an assignee of the United States."  *Post,* at 802
(opinion of STEVENS, J.); see also *post,* at 796 (same).  More precisely, we
are asserting that a *qui tam* relator is, in effect, suing as a *partial* assignee
of the United States.

*Poller* v. *Columbia Broadcasting System, Inc.,* 368 U. S. 464, 465 (1962); *Automatic Radio Mfg. Co.* v. *Hazeltine Research, Inc.,* 339 U. S. 827, 829 (1950); *Hubbard* v. *Tod,* 171 U. S. 474, 475 (1898)—and also suits by subrogees, who have been described as "equitable assign[ees]," L. Simpson, Law of Suretyship 205 (1950); see, *e. g., Vimar Seguros y Reaseguros, S. A.* v. *M/V Sky Reefer,* 515 U. S. 528, 531 (1995); *Musick, Peeler & Garrett* v. *Employers Ins. of Wausau,* 508 U. S. 286, 288 (1993). We conclude, therefore, that the United States' injury in fact suffices to confer standing on respondent Stevens.

We are confirmed in this conclusion by the long tradition of *qui tam* actions in England and the American Colonies. That history is particularly relevant to the constitutional standing inquiry since, as we have said elsewhere, Article III's restriction of the judicial power to "Cases" and "Controversies" is properly understood to mean "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." *Steel Co.,* 523 U. S., at 102; see also *Coleman* v. *Miller,* 307 U. S. 433, 460 (1939) (opinion of Frankfurter, J.) (the Constitution established that "[j]udicial power could come into play only in matters that were the traditional concern of the courts at Westminster and only if they arose in ways that to the expert feel of lawyers constituted 'Cases' or 'Controversies' ").

*Qui tam* actions appear to have originated around the end of the 13th century, when private individuals who had suffered injury began bringing actions in the royal courts on both their own and the Crown's behalf. See, *e. g., Prior of Lewes* v. *De Holt* (1300), reprinted in 48 Selden Society 198 (1931). Suit in this dual capacity was a device for getting their private claims into the respected royal courts, which generally entertained only matters involving the Crown's interests. See Milsom, Trespass from Henry III to Edward III, Part III: More Special Writs and Conclusions,

74 L. Q. Rev. 561, 585 (1958). Starting in the 14th century, as the royal courts began to extend jurisdiction to suits involving wholly private wrongs, the common-law *qui tam* action gradually fell into disuse, although it seems to have remained technically available for several centuries. See 2 W. Hawkins, Pleas of the Crown 369 (8th ed. 1824).

At about the same time, however, Parliament began enacting statutes that explicitly provided for *qui tam* suits. These were of two types: those that allowed injured parties to sue in vindication of their own interests (as well as the Crown's), see, *e. g.*, Statute Providing a Remedy for Him Who Is Wrongfully Pursued in the Court of Admiralty, 2 Hen. IV, ch. 11 (1400), and—more relevant here—those that allowed informers to obtain a portion of the penalty as a bounty for their information, even if they had not suffered an injury themselves, see, *e. g.*, Statute Prohibiting the Sale of Wares After the Close of Fair, 5 Edw. III, ch. 5 (1331); see generally Common Informers Act, 14 & 15 Geo. VI, ch. 39, sched. (1951) (listing informer statutes). Most, though not all, of the informer statutes expressly gave the informer a cause of action, typically by bill, plaint, information, or action of debt. See, *e. g.*, Bill for Leases of Hospitals, Colleges, and Other Corporations, 33 Hen. VIII, ch. 27 (1541); Act to Avoid Horse-Stealing, 31 Eliz. I, ch. 12, § 2 (1589); Act to Prevent the Over-Charge of the People by Stewards of Court-Leets and Court-Barons, 2 Jac. I, ch. 5 (1604).

For obvious reasons, the informer statutes were highly subject to abuse, see M. Davies, The Enforcement of English Apprenticeship 58–61 (1956)—particularly those relating to obsolete offenses, see generally 3 E. Coke, Institutes of the Laws of England 191 (4th ed. 1797) (informer prosecutions under obsolete statutes had been used to "vex and entangle the subject"). Thus, many of the old enactments were repealed, see Act for Continuing and Reviving of Divers Statutes and Repeal of Divers Others, 21 Jac. I, ch. 28, § 11

(1623), and statutes were passed deterring and penalizing vexatious informers, limiting the locations in which informer suits could be brought, and subjecting such suits to relatively short statutes of limitation, see Act to Redress Disorders in Common Informers, 18 Eliz. I, ch. 5 (1576); Act Concerning Informers, 31 Eliz. I, ch. 5 (1589); see generally Davies, *supra*, at 63–76. Nevertheless, laws allowing *qui tam* suits by informers continued to exist in England until 1951, when all of the remaining ones were repealed. See Note, The History and Development of Qui Tam, 1972 Wash. U. L. Q. 81, 88, and n. 44 (citing Common Informers Act, 14 & 15 Geo. VI, ch. 39 (1951)).

*Qui tam* actions appear to have been as prevalent in America as in England, at least in the period immediately before and after the framing of the Constitution. Although there is no evidence that the Colonies allowed common-law *qui tam* actions (which, as we have noted, were dying out in England by that time), they did pass several informer statutes expressly authorizing *qui tam* suits. See, *e. g.*, Act for the Restraining and Punishing of Privateers and Pirates, 1st Assembly, 4th Sess. (N. Y. 1692), reprinted in 1 Colonial Laws of New York 279, 281 (1894) (allowing informers to sue for, and receive share of, fine imposed upon officers who neglect their duty to pursue privateers and pirates). Moreover, immediately after the framing, the First Congress enacted a considerable number of informer statutes.[5] Like their English counterparts, some of them

---

[5] In addition, the First Congress passed one statute allowing injured parties to sue for damages on both their own and the United States' behalf. See Act of May 31, 1790, ch. 15, §2, 1 Stat. 124–125 (allowing author or proprietor to sue for and receive half of penalty for violation of copyright); cf. Act of Mar. 1, 1790, ch. 2, §6, 1 Stat. 103 (allowing census taker to sue for and receive half of penalty for failure to cooperate in census); Act of July 5, 1790, ch. 25, §1, 1 Stat. 129 (extending same to Rhode Island).

provided both a bounty and an express cause of action;[6] others provided a bounty only.[7]

We think this history well nigh conclusive with respect to the question before us here: whether *qui tam* actions were "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." *Steel Co.*, 523

---

[6] See Act of Mar. 1, 1790, ch. 2, §3, 1 Stat. 102 (allowing informer to sue for, and receive half of fine for, failure to file census return); Act of July 5, 1790, ch. 25, §1, 1 Stat. 129 (extending same to Rhode Island); Act of July 20, 1790, ch. 29, §§1, 4, 1 Stat. 131, 133 (allowing private individual to sue for, and receive half of fine for, carriage of seamen without contract or illegal harboring of runaway seamen); Act of July 22, 1790, ch. 33, §3, 1 Stat. 137–138 (allowing private individual to sue for, and receive half of goods forfeited for, unlicensed trading with Indian tribes); Act of Mar. 3, 1791, ch. 15, §44, 1 Stat. 209 (allowing person who discovers violation of spirits duties, or officer who seizes contraband spirits, to sue for and receive half of penalty and forfeiture, along with costs, in action of debt); cf. Act of Apr. 30, 1790, ch. 9, §§16, 17, 1 Stat. 116 (allowing informer to conduct prosecution, and receive half of fine, for criminal larceny or receipt of stolen goods).

[7] See Act of July 31, 1789, ch. 5, §29, 1 Stat. 44–45 (giving informer full penalty paid by customs official for failing to post fee schedule); Act of Aug. 4, 1790, ch. 35, §55, 1 Stat. 173 (same); Act of July 31, 1789, ch. 5, §38, 1 Stat. 48 (giving informer quarter of penalties, fines, and forfeitures authorized under a customs law); Act of Sept. 1, 1789, ch. 11, §21, 1 Stat. 60 (same under a maritime law); Act of Aug. 4, 1790, ch. 35, §69, 1 Stat. 177 (same under another customs law); Act of Sept. 2, 1789, ch. 12, §8, 1 Stat. 67 (providing informer half of penalty upon conviction for violation of conflict-of-interest and bribery provisions in Act establishing Treasury Department); Act of Mar. 3, 1791, ch. 8, §1, 1 Stat. 215 (extending same to additional Treasury employees); Act of Feb. 25, 1791, ch. 10, §§8, 9, 1 Stat. 195–196 (providing informer half or fifth of fines resulting from improper trading or lending by agents of Bank of United States); cf. Act of Aug. 4, 1790, ch. 35, §4, 1 Stat. 153 (apportioning half of penalty for failing to deposit ship manifest to official who should have received manifest, and half to collector in port of destination).

We have suggested, in dictum, that "[s]tatutes providing for a reward to informers which do not specifically either authorize or forbid the informer to institute the action are construed to authorize him to sue." *United States ex rel. Marcus* v. *Hess*, 317 U. S. 537, 541, n. 4 (1943).

U. S., at 102. When combined with the theoretical justification for relator standing discussed earlier, it leaves no room for doubt that a *qui tam* relator under the FCA has Article III standing.[8] We turn, then, to the merits.

## III

Petitioner makes two contentions: (1) that a State (or state agency) is not a "person" subject to *qui tam* liability under the FCA; and (2) that if it is, the Eleventh Amendment bars such a suit. The Courts of Appeals have disagreed as to the order in which these statutory and Eleventh Amendment immunity questions should be addressed. Compare *United States ex rel. Long* v. *SCS Business & Technical Institute, Inc.*, 173 F. 3d 890, 893–898 (CADC 1999) (statutory question first), with *United States ex rel. Foulds* v. *Texas Tech Univ.*, 171 F. 3d 279, 285–288 (CA5 1999) (Eleventh Amendment immunity question first).

Questions of jurisdiction, of course, should be given priority—since if there is no jurisdiction there is no authority to sit in judgment of anything else. See *Steel Co., supra,* at 93–102. "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the

---

[8] In so concluding, we express no view on the question whether *qui tam* suits violate Article II, in particular the Appointments Clause of §2 and the "take Care" Clause of §3. Petitioner does not challenge the *qui tam* mechanism under either of those provisions, nor is the validity of *qui tam* suits under those provisions a jurisdictional issue that we must resolve here. See *Steel Co.* v. *Citizens for Better Environment,* 523 U. S. 83, 102, n. 4 (1998) ("[O]ur standing jurisprudence, . . . though it may sometimes have an impact on Presidential powers, derives from Article III and not Article II"); see also *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 576–578 (1992).

The dissent implicitly attacks us for "introduc[ing] [this question] *sua sponte." Post,* at 801. We raise the question, however, only to make clear that it is not at issue in this case. It is only the dissent that proceeds to volunteer an answer. See *post,* at 801–802.

cause." *Ex parte McCardle*, 7 Wall. 506, 514 (1869). Even jurisdiction over the person (as opposed to subject-matter jurisdiction) "is 'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'" *Ruhrgas AG* v. *Marathon Oil Co.*, 526 U. S. 574, 584 (1999) (quoting *Employers Reinsurance Corp.* v. *Bryant*, 299 U. S. 374, 382 (1937)).

We nonetheless have routinely addressed *before* the question whether the Eleventh Amendment forbids a particular statutory cause of action to be asserted against States, the question whether the statute itself *permits* the cause of action it creates to be asserted against States (which it can do only by clearly expressing such an intent). See, *e. g., Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 73–78 (2000); *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 55–57 (1996); cf. *Hafer* v. *Melo*, 502 U. S. 21, 25–31 (1991); *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 277–281 (1977). When these two questions are at issue, not only is the statutory question "logically antecedent to the existence of" the Eleventh Amendment question, *Amchem Products, Inc.* v. *Windsor*, 521 U. S. 591, 612 (1997), but also there is no realistic possibility that addressing the statutory question will expand the Court's power beyond the limits that the jurisdictional restriction has imposed. The question whether the statute provides for suits against the States (as opposed, for example, to the broader question whether the statute creates any private cause of action whatever, or the question whether the facts alleged make out a "false claim" under the statute) does not, as a practical matter, permit the court to pronounce upon any issue, or upon the rights of any person, beyond the issues and persons that would be reached under the Eleventh Amendment inquiry anyway. The ultimate issue in the statutory inquiry is whether States can be sued under this statute; and the ultimate issue in the Eleventh Amendment inquiry is whether unconsenting States can be sued under this statute. This combination of logical priority

and virtual coincidence of scope makes it possible, and indeed appropriate, to decide the statutory issue first. We therefore begin (and will end) with the statutory question.

The relevant provision of the FCA, 31 U. S. C. § 3729(a), subjects to liability "[a]ny person" who, *inter alia*, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." We must apply to this text our longstanding interpretive presumption that "person" does not include the sovereign. See *United States v. Cooper Corp.*, 312 U. S. 600, 604 (1941); *United States v. Mine Workers*, 330 U. S. 258, 275 (1947).[9] The

---

[9] The dissent claims that, "[a]lthough general statutory references to 'persons' are not normally construed to apply to the enacting sovereign, when Congress uses that word in federal statutes enforceable by the Federal Government or by a federal agency, it applies to States and state agencies as well as to private individuals and corporations." *Post*, at 790 (citation omitted). The dissent cites three cases in support of this assertion. None of them, however, involved a statutory provision authorizing private suit against a State. *California v. United States*, 320 U. S. 577 (1944), disregarded the presumption in a case brought against a State by the Federal Government (and under a statutory provision authorizing suit *only* by the Federal Government). See *id.*, at 585–586. *United States v. California*, 297 U. S. 175 (1936), found the presumption overcome in similar circumstances—and with regard to a statute that used not the word "person," but rather the phrase "common carrier." See *id.*, at 186–187. And *Georgia v. Evans*, 316 U. S. 159 (1942), held that the presumption was overcome when, if a State were not regarded as a "person" for purposes of *bringing* an action under § 7 of the Sherman Act, it would be left "without any redress for injuries resulting from practices outlawed by that Act." *Id.*, at 162.

The dissent contends that "[t]he reason for presuming that an enacting sovereign does not intend to authorize litigation against itself simply does not apply to federal statutes that apply equally to state agencies and private entities." *Post*, at 798. That is true enough, but in the American system there is a different reason, equally valid. While the States do not have the immunity against federally authorized suit that international law has traditionally accorded foreign sovereigns, see *National City Bank of N. Y. v. Republic of China*, 348 U. S. 356, 358–359 (1955), they are sovereigns nonetheless, and both comity and respect for our federal system

presumption is "particularly applicable where it is claimed that Congress has subjected the States to liability to which they had not been subject before." *Will* v. *Michigan Dept. of State Police,* 491 U. S. 58, 64 (1989); *Wilson* v. *Omaha Tribe,* 442 U. S. 653, 667 (1979). The presumption is, of course, not a "hard and fast rule of exclusion," *Cooper Corp., supra,* at 604–605, but it may be disregarded only upon some affirmative showing of statutory intent to the contrary. See *International Primate Protection League* v. *Administrators of Tulane Ed. Fund,* 500 U. S. 72, 83 (1991).

As the historical context makes clear, and as we have often observed, the FCA was enacted in 1863 with the principal goal of "stopping the massive frauds perpetrated by large [private] contractors during the Civil War." *United States* v. *Bornstein,* 423 U. S. 303, 309 (1976); see also *United States ex rel. Marcus* v. *Hess,* 317 U. S. 537, 547 (1943).[10]   Its

---

demand that something more than mere use of the word "person" demonstrate the federal intent to authorize unconsented private suit against them.   In any event, JUSTICE STEVENS fought and lost this battle in *Will* v. *Michigan Dept. of State Police,* 491 U. S. 58 (1989), in which the Court applied the presumption to a federal statute when the "person" at issue was a State.   See *id.,* at 64; but see *id.,* at 73 (Brennan, J., dissenting, joined by Marshall, Blackmun, and STEVENS, JJ.).   Moreover, JUSTICE STEVENS actually joined the Court's opinion in *Wilson* v. *Omaha Tribe,* 442 U. S. 653 (1979), in which the Court likewise applied the presumption to a federal statute in a case involving a State.   See *id.,* at 667.   (*Wilson* is omitted from the dissent's discussion of "[c]ases decided before 1986," which it claims "uniformly support" its reading of the statute.   *Post,* at 790.)

[10] The dissent contends that the FCA was "intended to cover the full range of fraudulent acts, including those perpetrated by States." *Post,* at 793, and n. 4 (quoting *United States* v. *Neifert-White Co.,* 390 U. S. 228, 232 (1968); *Rainwater* v. *United States,* 356 U. S. 590, 592 (1958); H. R. Rep. No. 99–660, p. 18 (1985)).   The sources the dissent quotes, however, support its contention only as far as the comma.   They stand for the unobjectionable proposition (codified in § 3729(c)) that the FCA was intended to cover all types of *fraud,* not for the additional proposition that the FCA was intended to cover all types of *fraudsters,* including States.

liability provision—the precursor to today's § 3729(a)—bore no indication that States were subject to its penalties. Indeed, far from indicating that *States* were covered, it did not even make clear that *private corporations* were, since it applied only to "any person not in the military or naval forces of the United States, nor in the militia called into or actually employed in the service of the United States," and imposed criminal penalties that included imprisonment.[11] Act of Mar. 2, 1863, ch. 67, § 3, 12 Stat. 698. We do not suggest that these features directed only at natural persons cast doubt upon the courts' assumption that § 3729(a) extends to corporations, see, *e. g., United States ex rel. Woodard* v. *Country View Care Center, Inc.,* 797 F. 2d 888, 890 (CA10 1986)—but that is because the presumption with regard to corporations is just the opposite of the one governing here: they are presumptively *covered* by the term "person," see 1 U. S. C. § 1. But the text of the original statute does less than nothing to overcome the presumption that States are *not* covered.

Although the liability provision of the original FCA has undergone various changes, none of them suggests a broadening of the term "person" to include States. In 1982, Congress made a housekeeping change, replacing the phrase "any person not in the military or naval forces of the United States, nor in the militia called into or actually employed in the service of the United States" with the phrase "[a] person not a member of an armed force of the United States," thereby incorporating the term of art "member of an armed force" used throughout Title 10 of the United States Code. 31 U. S. C. § 3729 (1982 ed.). And in 1986, Congress eliminated the blanket exemption for members of the Armed Forces, replacing the phrase "[a] person not a member of an

---

[11] The criminal provision remains on the books and is currently codified separately, as amended, at 18 U. S. C. § 287.

armed force of the United States" with the current "[a]ny person." 31 U. S. C. § 3729(a).[12]

Several features of the current statutory scheme further support the conclusion that States are not subject to *qui tam* liability. First, another section of the FCA, 31 U. S. C. § 3733, which enables the Attorney General to issue civil investigative demands to "any person . . . possessi[ng] information relevant to a false claims law investigation," § 3733(a)(1),

---

[12] The dissent claims that "[t]he term 'person' in § 3729(a) that we are interpreting today was enacted by the 1986 Congress, not by the 1863 Congress." *Post,* at 794, n. 5. But the term "person" has remained in the statute unchanged since 1863; the 1986 amendment merely changed the modifier "[a]" to "[a]ny." This no more caused the word "person" to include States than did the replacement of the word "any" with "[a]" four years earlier. The dissent's sole basis for giving the change from "[a]" to "[a]ny" this precise and unusual consequence is a single sentence of legislative history from the 1986 Congress. That would be unequal to the task in any event, but as it happens the sentence was not even describing the consequence of the proposed revision, but was setting forth a Senate Committee's (erroneous) understanding of the meaning of the statutory term enacted some 123 years earlier. The paragraph in which the sentence appears discusses the FCA "[i]n its present," *i. e.,* pre-1986, "form." S. Rep. No. 99–345, p. 8 (1986).

The dissent contradicts its contention that the "intent" of the 1986 Congress, rather than that of the 1863 Congress, controls here, by relying heavily on a House Committee Report from 1862. *Post,* at 791–792 (citing H. R. Rep. No. 2, 37th Cong., 2d Sess., pt. ii–a, pp. xxxviii–xxxix (1862)). Even for those disposed to allow the meaning of a statute to be determined by a single committee, that Report is utterly irrelevant, since it was not prepared in connection with the 1863 Act, or indeed in connection with any proposed false claims legislation. In repeating the Second Circuit's unsupported assertion that Congress must have had this Report in mind a year later when it enacted the FCA, the dissent asks us to indulge even a greater suspension of disbelief than legislative history normally requires. And finally, this irrelevant committee Report does not provide the promised support for the view that "[t]he False Claims Act is . . . as capable of being violated by state as by individual action," *post,* at 791. The cited portion details a single incident of fraud by a state *official* against a *State,* not an incident of fraud by a State against the Federal Government.

contains a provision expressly defining "person," "[f]or purposes of this section," to include States, § 3733(*l*)(4).[13] The presence of such a definitional provision in § 3733, together with the absence of such a provision from the definitional provisions contained in § 3729, see §§ 3729(b)–(c), suggests that States are not "persons" for purposes of *qui tam* liability under § 3729.[14]

Second, the current version of the FCA imposes damages that are essentially punitive in nature, which would be in-

_____

[13] The dissent points out that the definition of "person" in § 3733(*l*)(4) also applies to § 3733(*l*)(2), a definitional provision which defines the phrase "false claims law investigation" as "any inquiry conducted by any false claims law investigator for the purpose of ascertaining whether any person is or has been engaged in any violation of a false claims law." See *post*, at 789, 795. But the effect of assuming a State to be a "person" for purposes of that definitional section is *not* to embrace investigations of States within the definition. A "false claims investigation" will *still* not include an investigation of a State, since whether a "person" (*however* broadly defined) "is or has been engaged in any violation of a false claims law" depends on whether that person is *subject to* the "false claims law," which refers us back to § 3729, to which § 3733(*l*)(4)'s definition of "person" is explicitly made inapplicable. What the application of § 3733(*l*)(4) to § 3733(*l*)(2) *does* achieve is to subject States, *not* to *qui tam* liability, but to civil investigative demands. That is entirely appropriate, since States will often be able to provide useful evidence in investigations of private contractors.

[14] The dissent contends that our argument "prove[s] too much," since the definition of "person" in § 3733(*l*)(4) includes not just States, but also "any natural person, partnership, corporation, association, or other legal entity"; under our reasoning, it contends, all of those entities would *also* be excluded from the definition of "person" under § 3729. *Post*, at 799. That is not so. Unlike States, all of those entities are presumptively *covered* by the term "person." See 1 U. S. C. § 1. The *addition* of States to 31 U. S. C. § 3733, and the failure to add States to § 3729, suggests that States are not subject to *qui tam* liability under § 3729.

The dissent attempts to explain the absence of a definitional provision in § 3729 by suggesting that Congress "simply saw no need to add a definition of 'person' in § 3729 because . . . the meaning of the term 'person' was already well understood." *Post*, at 799. If that were so, and if the "understanding" included States, there would have been no need to include a definition of "person" in *§ 3733*.

consistent with state *qui tam* liability in light of the presumption against imposition of punitive damages on governmental entities. See, *e. g.*, *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 262–263 (1981).[15] Although this Court suggested that damages under an earlier version of the FCA were remedial rather than punitive, see *Bornstein*, 423 U. S., at 315; but see *Smith* v. *Wade*, 461 U. S. 30, 85 (1983) (REHNQUIST, J., dissenting), that version of the statute imposed only double damages and a civil penalty of $2,000 per claim, see 31 U. S. C. § 231 (1976 ed.); the current version, by contrast, generally imposes treble damages and a civil penalty of up to $10,000 per claim, see 31 U. S. C. § 3729(a).[16] Cf. *Marcus*, 317 U. S., at 550 (noting that double damages in

---

[15] The dissent attempts to distinguish *Newport* on the basis of a single sentence in that opinion stating that "courts vie[w] punitive damages [against governmental bodies] as contrary to sound public policy, because such awards would burden the very taxpayers and citizens for whose benefit the wrongdoer was being chastised." *Newport* v. *Fact Concerts, Inc.*, 453 U. S., at 263. The dissent contends that *Newport* is inapplicable where, as here, "[t]he taxpaying 'citizens for whose benefit' the [statute] is designed are the citizens of the United States, not the citizens of any individual State that might violate the [statute]." *Post*, at 801. The problem with this is that Rev. Stat. § 1979, 42 U. S. C. § 1983—the statute at issue in *Newport*—is, like the FCA, a federal law designed to benefit "the citizens of the United States, not the citizens of any individual State that might violate the [statute]." A better reading of *Newport* is that we were concerned with imposing punitive damages on taxpayers under any circumstances. "'[Punitive damages], being evidently vindictive, cannot, in our opinion, be sanctioned by this court, as they are to be borne by widows, orphans, aged men and women, and strangers, who, admitting that they must repair the injury inflicted by the Mayor on the plaintiff, cannot be bound beyond that amount, which will be sufficient for her indemnification.'" *Newport, supra*, at 261 (quoting *McGary* v. *President & Council of City of Lafayette*, 12 Rob. 668, 677 (La. 1846)).

[16] As the dissent correctly points out, see *post*, at 801, n. 11, treble damages may be reduced to double damages in certain cases, see § 3729(a). This exception, however, applies only in some of those (presumably few) cases involving defendants who provide information concerning the violation before they have knowledge that an investigation is underway. See *ibid.*

original FCA were not punitive, but suggesting that treble damages, such as those in the antitrust laws, would have been). "The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers." *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 639 (1981).

Third, the Program Fraud Civil Remedies Act of 1986 (PFCRA), a sister scheme creating administrative remedies for false claims—and enacted just before the FCA was amended in 1986—contains (unlike the FCA) a definition of "persons" subject to liability, and that definition does not include States. See 31 U. S. C. § 3801(a)(6) (defining "person" as "any individual, partnership, corporation, association, or private organization"). It would be most peculiar to subject States to treble damages and civil penalties in *qui tam* actions under the FCA, but exempt them from the relatively smaller damages provided under the PFCRA. See § 3802(a)(1).[17]

---

[17] The dissent attempts to distinguish the PFCRA on the ground that it is a separate and subsequently enacted statute. See *post,* at 799–800, and n. 10. But it is well established that a court can, and should, interpret the text of one statute in the light of text of surrounding statutes, even those subsequently enacted. See *FDA* v. *Brown & Williamson Tobacco Corp., ante,* at 133; *United States* v. *Fausto,* 484 U. S. 439, 453 (1988). Moreover, there is no question that the PFCRA was designed to operate in tandem with the FCA. Not only was it enacted at virtually the same time as the FCA was amended in 1986, but its scope is virtually identical to that of the FCA. Compare § 3729(a) (FCA) ("Any person who . . . knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval . . .") with § 3802(a)(1) (PFCRA) ("Any person who makes, presents, or submits, or causes to be made, presented, or submitted, a claim that the person knows or has reason to know . . . is false, fictitious, or fraudulent . . ."). The dissent would, in any event, subject States to suit under the PFCRA no less than under the FCA—despite its detailed definition of "person" that does not include States. In justification of this the dissent again cites *California* v. *United States,* 320 U. S.,

In sum, we believe that various features of the FCA, both as originally enacted and as amended, far from providing the requisite affirmative indications that the term "person" included States for purposes of *qui tam* liability, indicate quite the contrary. Our conclusion is buttressed by two other considerations that we think it unnecessary to discuss at any length: first, "the ordinary rule of statutory construction" that "if Congress intends to alter the usual constitutional balance between States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute," *Will*, 491 U. S., at 65 (internal quotation marks and citation omitted); see also *Gregory* v. *Ashcroft*, 501 U. S. 452, 460–461 (1991); *United States* v. *Bass*, 404 U. S. 336, 349 (1971), and second, the doctrine that statutes should be construed so as to avoid difficult constitutional questions. We of course express no view on the question whether an action in federal court by a *qui tam* relator against a State would run afoul of the Eleventh Amendment, but we note that there is "a serious doubt" on that score. *Ashwander* v. *TVA*, 297 U. S. 288, 348 (1936) (Brandeis, J., concurring) (internal quotation marks and citation omitted).[18]

\*    \*    \*

We hold that a private individual has standing to bring suit in federal court on behalf of the United States under the False Claims Act, 31 U. S. C. §§ 3729–3733, but that the

---

at 585, and *Evans*, 316 U. S., at 160. In addition to being inapposite because they did not authorize suits against States by private parties, see n. 9, *supra*, the definitions of "person" in the statutes at issue in those cases were not as detailed as that of the PFCRA, and set forth what the term "person" *included*, rather than, as the PFCRA does, what the term "person" *"means,"* see 31 U. S. C. § 3801(a)(6) (emphasis added).

[18] Although the dissent concludes that States can be "persons" for purposes of *commencing* an FCA *qui tam* action under § 3730(b), see *post*, at 794–795, we need not resolve that question here, and therefore leave it open.

False Claims Act does not subject a State (or state agency) to liability in such actions. The judgment of the Second Circuit is reversed.

*It is so ordered.*

JUSTICE BREYER, concurring.

I join the opinion of the Court in full. I also join the opinion of JUSTICE GINSBURG.

JUSTICE GINSBURG, with whom JUSTICE BREYER joins, concurring in the judgment.

I join the Court's judgment and here state the extent to which I subscribe to the Court's opinion.

I agree with the Court that the *qui tam* relator is properly regarded as an assignee of a portion of the Government's claim for damages. See *ante,* at 773. And I agree, most vitally, that "Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *Ante,* at 774. On that key matter, I again agree that history's pages place the *qui tam* suit safely within the "case" or "controversy" category. See *ante,* at 774–778.

In *Steel Co.* v. *Citizens for Better Environment,* 523 U. S. 83 (1998), I reasoned that if Congress did not authorize a citizen suit, a court should dismiss the citizen suitor's complaint without opining "on the constitutionality of what Congress might have done, but did not do." *Id.,* at 134 (opinion concurring in judgment). I therefore agree that the Court properly turns first to the statutory question here presented: Did Congress authorize *qui tam* suits against the States. Concluding that Congress did not authorize such suits, the Court has no cause to engage in an Eleventh Amendment inquiry, and appropriately leaves that issue open.

I do not find in the False Claims Act any clear statement subjecting the States to *qui tam* suits brought by private

parties, and therefore concur in the Court's resolution of the statutory question. See *ante*, at 787–788. I note, however, that the clear statement rule applied to private suits against a State has not been applied when the United States is the plaintiff. See, *e. g.*, *Sims* v. *United States*, 359 U. S. 108, 112 (1959) (state agency ranks as a "person" subject to suit by the United States under federal tax levy provision); *United States* v. *California*, 297 U. S. 175, 186–187 (1936) (state-owned railway ranks as a "common carrier" under Federal Safety Appliance Act subject suit for penalties by the United States). I read the Court's decision to leave open the question whether the word "person" encompasses States when the United States itself sues under the False Claims Act.

JUSTICE STEVENS, with whom JUSTICE SOUTER joins, dissenting.

In 1986, Congress amended the False Claims Act (FCA or Act) to create a new procedure known as a "civil investigative demand," which allows the Attorney General to obtain documentary evidence "for the purpose of ascertaining whether any person is or has been engaged in" a violation of the Act—including a violation of 31 U. S. C. § 3729. The 1986 amendments also declare that a "person" who could engage in a violation of § 3729—thereby triggering the civil investigative demand provision—includes "any State or political subdivision of a State." See § 6(a), 100 Stat. 3168 (codified at 31 U. S. C. §§ 3733(*l*)(1)(A), (2), (4)). In my view, this statutory text makes it perfectly clear that Congress intended the term "person" in § 3729 to include States. This understanding is supported by the legislative history of the 1986 amendments, and is fully consistent with this Court's construction of federal statutes in cases decided before those amendments were enacted.

Since the FCA was amended in 1986, however, the Court has decided a series of cases that cloak the States with an increasingly protective mantle of "sovereign immunity" from

liability for violating federal laws. It is through the lens of those post-1986 cases that the Court has chosen to construe the statute at issue in this case. To explain my disagreement with the Court, I shall comment on pre-1986 cases, the legislative history of the 1986 amendments, and the statutory text of the FCA—all of which support the view that Congress understood States to be included within the meaning of the word "person" in § 3729. I shall then briefly explain why the State's constitutional defenses fail, even under the Court's post-1986 construction of the doctrine of sovereign immunity.

I

Cases decided before 1986 uniformly support the proposition that the broad language used in the FCA means what it says. Although general statutory references to "persons" are not normally construed to apply to the enacting sovereign, *United States* v. *Mine Workers,* 330 U. S. 258, 275 (1947), when Congress uses that word in federal statutes enforceable by the Federal Government or by a federal agency, it applies to States and state agencies as well as to private individuals and corporations. Thus, for example, the word "person" in the Sherman Act does not include the sovereign that enacted the statute (the Federal Government), *United States* v. *Cooper Corp.,* 312 U. S. 600 (1941), but it does include the States, *Georgia* v. *Evans,* 316 U. S. 159 (1942). Similarly, States are subject to regulation as a "person" within the meaning of the Shipping Act of 1916, *California* v. *United States,* 320 U. S. 577 (1944), and as a "common carrier" within the meaning of the Safety Appliance Act, *United States* v. *California,* 297 U. S. 175 (1936). In the latter case, the State of California "invoke[d] the canon of construction that a sovereign is presumptively not intended to be bound" by a statute unless the Act expressly declares that to be the case. *Id.,* at 186. We rejected the applicability of that canon, stating:

"We can perceive no reason for extending it so as to exempt a business carried on by a state from the otherwise applicable provisions of an act of Congress, all-embracing in scope and national in its purpose, which is as capable of being obstructed by state as by individual action. Language and objectives so plain are not to be thwarted by resort to a rule of construction whose purpose is but to resolve doubts, and whose application in the circumstances would be highly artificial." *Id.*, at 186–187.[1]

The False Claims Act is also all-embracing in scope, national in its purpose, and as capable of being violated by state as by individual action.[2] It was enacted during the Civil War, shortly after a congressional committee

---

[1] The difference between the post-1986 lens through which the Court views sovereign immunity issues, on the one hand, and the actual intent of Congress in statutes like the one before us today, on the other hand, is well illustrated by the congressional rejection of the holdings in *Hoffman* v. *Connecticut Dept. of Income Maintenance,* 492 U. S. 96 (1989), and *United States* v. *Nordic Village, Inc.,* 503 U. S. 30 (1992). In those cases, the Court refused to find the necessary unequivocal waiver of sovereign immunity against both the States and the Federal Government in § 106(c) of the Bankruptcy Code.

Congress, however, thought differently: "In enacting section 106(c), Congress intended . . . to make the States subject to a money judgment. But the Supreme Court in *Hoffman* v. *Connecticut Department of Income Maintenance,* 492 U. S. 96 (1989), held [otherwise.] In using such a narrow construction, the Court . . . did not find in the text of the statute an 'unmistakenly clear' intent of Congress to waive sovereign immunity . . . . The Court applied this reasoning in *United States* v. *Nordic Village, Inc.*" See 140 Cong. Rec. 27693 (1994). Congress therefore overruled both of those decisions by enacting the current version of 11 U. S. C. § 106.

[2] It is thus at the opposite pole from the statute construed in *Wilson* v. *Omaha Tribe,* 442 U. S. 653 (1979), which held that the term "white person" did not include the State of Iowa because "it is apparent that in adopting § 22 Congress had in mind only disputes arising in Indian country, disputes that would not arise in or involve any of the States." *Id.,* at 668.

had decried the "fraud and peculation" by state officials in connection with the procurement of military supplies and Government contracts—specifically mentioning the purchases of supplies by the States of Illinois, Indiana, New York, and Ohio. See H. R. Rep. No. 2, 37th Cong., 2d Sess., pt. ii–a, pp. XXXVIII–XXXIX (1862). Although the FCA was not enacted until the following year, the Court of Appeals for the Second Circuit correctly observed that "it is difficult to suppose that when Congress considered the bills leading to the 1863 Act a year later it either meant to exclude the States from the 'persons' who were to be liable for presentation of false claims to the federal government or had forgotten the results of this extensive investigation." 162 F. 3d 195, 206 (1998). That observation is faithful to the broad construction of the Act that this Court consistently endorsed in cases decided before 1986 (and hardly requires any "suspension of disbelief" as the majority supposes, *ante,* at 783, n. 12).

Thus, in *United States* v. *Neifert-White Co.,* 390 U. S. 228, 232 (1968), after noting that the Act was passed as a result of investigations of the fraudulent use of federal funds during the Civil War, we inferred "that the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." See also *Rainwater* v. *United States,* 356 U. S. 590, 592 (1958) ("It seems quite clear that the objective of Congress [in the FCA] was broadly to protect the funds and property of the Government from fraudulent claims"); H. R. Rep. No. 99–660, p. 18 (1986) ("[T]he False Claims Act is used as . . . the primary vehicle by the Government for recouping losses suffered through fraud"). Indeed, the fact that Congress has authorized *qui tam* actions by private individuals to supplement the remedies available to the Federal Government provides additional evidence of its intent to reach all types of fraud that cause financial loss to the Federal Government. Finally, the

breadth of the "claims" to which the FCA applies[3] only confirms the notion that the law was intended to cover the full range of fraudulent acts, including those perpetrated by States.[4]

The legislative history of the 1986 amendments discloses that both federal and state officials understood that States were "persons" within the meaning of the statute. Thus, in a section of the 1986 Senate Report describing the history of the Act, the committee unequivocally stated that the Act reaches all parties who may submit false claims and that "[t]he term 'person' is used in its broad sense to include partnerships, associations, and corporations . . . as well as States and political subdivisions thereof." S. Rep. No. 99–345, pp. 8–9.[5]

---

[3] Title 31 U. S. C. § 3729(c) reads: "For purposes of this section, 'claim' includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."

[4] When Congress amended the FCA in 1986, it noted that "[e]vidence of fraud in Government programs and procurement is on a steady rise." H. R. Rep. No. 99–660, at 18. And at that time, federal grants to state and local governments had totaled over $108 billion. See U. S. Dept. of Commerce National Data Book and Guide to Sources, Statistical Abstract of the United States 301 (108th ed. 1988) (compiling data from 1986). It is therefore difficult to believe, as the Court contends, that Congress intended "to cover all types of *fraud,* [but not] all types of *fraudsters,*" *ante,* at 781, n. 10, a conclusion that would exclude from coverage such a large share of potential fraud.

[5] Petitioner argues that the Senate Report's statement was simply inaccurate, because the three cases to which the Report cited for support did not interpret the meaning of the word "person" in the FCA. Brief for Petitioner 25–26. The cases stand for the proposition that the statutory term "person" may include States and local governments—exactly the proposition I have discussed above. See *supra,* at 790. Petitioner's observation that none of the cases cited is directly on point only indicates

Indeed, a few federal courts had accepted jurisdiction in *qui tam* cases brought by the States—thus indicating their view that States were included among the "persons" who may bring *qui tam* actions as relators under § 3730(b)(1). See *United States ex rel. Woodard* v. *Country View Care Center, Inc.*, 797 F. 2d 888 (CA10 1986); *United States ex rel. Wisconsin* v. *Dean*, 729 F. 2d 1100 (CA7 1984); see also *United States ex rel. Hartigan* v. *Palumbo Bros., Inc.*, 797 F. Supp. 624 (ND Ill. 1992). Not only do these cases express the view of those federal judges who thought a State could be a "person" under § 3730(b)(1), but the cases also demonstrate that the States considered themselves to be statutory "persons." In fact, in the *Dean* case, the United States filed a statement with the court explicitly stating its view that "[t]he State is a proper relator." 729 F. 2d, at 1103, n. 2. And when the Seventh Circuit in that case dismissed Wisconsin's *qui tam* claim on grounds unrelated to the definition

---

that the Senate's understanding was based on an analogy rather than on controlling precedent.

Petitioner further argues that the text of the FCA as it was originally enacted in 1863 could not have included States as "persons," and therefore the Senate's understanding of the pre-1986 Act was erroneous. See also *ante*, at 778. Assuming for argument's sake that the Senate incorrectly ascertained what Congress meant in 1863, petitioner's argument is beside the point. The term "person" in § 3729(a) that we are interpreting today was enacted by the 1986 Congress, not by the 1863 Congress. See 100 Stat. 3153 (deleting entirely the previously existing introductory clause in § 3729, including the phrase "[a] person not a member of an armed force of the United States" and replacing it with the new phrase "[a]ny person"). Therefore, even if the 1986 Congress were mistaken about what a *previous* Legislature had meant by the word "person," it clearly expressed its own view that when the *1986 Congress itself* enacted the word "person" (and not merely the word "any" as the Court insists, *ante*, at 783, n. 12), it meant the reference to include States. There is not the least bit of contradiction (as the Court suggests, *ibid.*) in one Congress informing itself of the general understanding of a statutory term it enacts based on its own (perhaps erroneous) understanding of what a past Congress thought the term meant.

of the word "person," the National Association of Attorneys General adopted a resolution urging Congress to make it easier for States to be relators.[6]   When Congress amended the FCA in 1986—and enacted the word "person" in § 3729 at issue here—it had all of this information before it, *i. e.*, that federal judges had accepted States as relators (and hence as "persons"); that the States considered themselves to be statutory "persons" and wanted greater freedom to be "persons" who could sue under the Act; and that the United States had taken a like position.   See S. Rep. No. 99–345, at 12–13.

In sum, it is quite clear that when the 1986 amendments were adopted, there was a general understanding that States and state agencies were "persons" within the meaning of the Act.

## II

The text of the 1986 amendments confirms the pre-existing understanding.   The most significant part of the amendments is the enactment of a new § 3733 granting authority to the Attorney General to issue a civil investigative demand (CID) before commencing a civil proceeding on behalf of the United States.   A series of interwoven definitions in § 3733 unambiguously demonstrates that a State is a "person" who can violate § 3729.

Section 3733 authorizes the Attorney General to issue a CID when she is conducting a "false claims law investigation."   § 3733(a).   A "false claims law investigation" is defined as an investigation conducted "for the purpose of ascertaining whether *any person* is or has been engaged in any violation of a false claims law."   § 3733(*l*)(2) (emphasis added).   And a "false claims law" includes § 3729—the provision at issue in this case.   § 3733(*l*)(1)(A).   Quite plainly, these provisions contemplate that any "person" may be en-

---

[6] Congress adopted the suggestion of the Attorneys General in § 3730(e)(4)(A).

gaged in a violation of § 3729. Finally, a "person" is defined to include "any State or political subdivision of a State." § 3733(*l*)(4). Hence, the CID provisions clearly state that a "person" who may be "engaged in any violation of a false claims law," including § 3729, includes a "State or a political subdivision of a State."[7] These CID provisions thus unmistakably express Congress' understanding that a State may be a "person" who can violate § 3729.

Elsewhere in the False Claims Act the term "person" includes States as well. For example, § 3730 of the Act— both before and after the 1986 amendments—uses the word "person" twice. First, subsection (a) of § 3730 directs the Attorney General to investigate violations of § 3729, and provides that if she "finds that a *person* has violated or is violating" that section, she may bring a civil action "under this section against the *person*." (Emphases added.) Second, subsection (b) of § 3730 also uses the word "person," though for a different purpose; in that subsection the word is used to describe the plaintiffs who may bring *qui tam* actions on behalf of themselves and the United States.

Quite clearly, a State is a "person" against whom the Attorney General may proceed under § 3730(a).[8] And as I noted earlier, see *supra*, at 794, before 1986 States were considered "persons" who could bring a *qui tam* action as a relator under § 3730(b)—and the Court offers nothing to question that understanding. See *ante*, at 787, n. 18. Moreover, when a *qui tam* relator brings an action on behalf of the United States, he or she is, in effect, authorized to act as an assignee of the Federal Government's claim. See *ante*, at 773. Given that understanding, combined with the fact

---

[7] Because this concatenation of definitions expressly references and incorporates § 3729, it is no answer that the definitions listed in § 3733 apply, by their terms, "[f]or the purposes of" § 3733.

[8] JUSTICE GINSBURG, who joins in the Court's judgment, is careful to point out that the Court does not disagree with this reading of § 3730(a). *Ante*, at 789.

that § 3730(a) does not make any distinction between possible defendants against whom the Attorney General may bring an action, the most normal inference to draw is that *qui tam* actions may be brought by relators against the same category of "persons" that may be sued by the Attorney General.

To recapitulate, it is undisputed that (under the CID provision) a State is a "person" who may violate § 3729; that a State is a "person" who may be named as a defendant in an action brought by the Attorney General; and that a State is a "person" who may bring a *qui tam* action on behalf of the United States. It therefore seems most natural to read the adjacent uses of the term "person" in §§ 3729, 3730(a), 3730(b), and 3733 to cover the same category of defendants. See *United States* v. *Cooper Corp.*, 312 U. S., at 606 ("It is hardly credible that Congress used the term 'person' in different senses in the same sentence"). And it seems even more natural to read the single word "person" (describing who may commit a violation under § 3729) to have one consistent meaning regardless of whether the action against that violator is brought under § 3730(a) or under § 3730(b). See *Ratzlaf* v. *United States*, 510 U. S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears. We have even stronger cause to construe a single formulation . . . the same way each time it is called into play" (citation omitted)). Absent powerful arguments to the contrary, it should follow that a State may be named as a defendant in an action brought by an assignee of the United States. Rather than pointing to any such powerful arguments, however, the Court comes to a contrary conclusion on the basis of an inapplicable presumption and rather strained inferences drawn from three different statutory provisions.

The Court's principal argument relies on "our longstanding interpretive presumption that 'person' does not include the sovereign." *Ante*, at 780. As discussed earlier, that

"presumption" does not quite do the heavy lifting the Court would like it to do. What's more, the doctrinal origins of that "presumption" meant only that the *enacting sovereign* was not normally thought to be a statutory "person." See, *e. g., United States* v. *California,* 297 U. S., at 186 ("[T]he canon of construction that a sovereign is presumptively not intended to be bound by its own statute unless named in it . . . has its historical basis in the English doctrine that the Crown is unaffected by acts of Parliament not specifically directed against it. The presumption is an aid to consistent construction of statutes of the *enacting sovereign* when their purpose is in doubt" (emphasis added)); see also *United States* v. *Mine Workers,* 330 U. S., at 275; *United States* v. *Fox,* 94 U. S. 315, 321 (1877); *Will* v. *Michigan Dept. of State Police,* 491 U. S. 58, 73 (1989) (Brennan, J., dissenting). The reason for presuming that an enacting sovereign does not intend to authorize litigation against itself simply does not apply to federal statutes that apply equally to state agencies and private entities. Finally, the "affirmative showing" the Court would require to demonstrate that the word "person" includes States, *ante,* at 781, is plainly found in the statutory text discussed above.

The Court's first textual argument is based on the fact that the definition of the term "person" included in § 3733's CID provision expressly includes States. "The presence of such a definitional provision in § 3733," the Court argues, "together with the absence of such a provision from the definitional provisions contained in § 3729 . . . suggests that States are not 'persons' for purposes of *qui tam* liability under § 3729." *Ante,* at 784. Leaving aside the fact that § 3733's definition actually cuts in the opposite direction, see *supra,* at 795–796, this argument might carry some weight if the definitional provisions in § 3729 included *some* definition of "person" but simply neglected to mention States. But the definitional provisions in § 3729 do not in-

clude any definition of "person" at all. The negative inference drawn by the Court, if taken seriously, would therefore prove too much. The definition of "person" in §3733 includes not only States, but also "any natural person, partnership, corporation, association, or other legal entity." §3733(*l*)(4). If the premise of the Court's argument were correct—that the inclusion of certain items as a "person" in §3733 implies their exclusion as a "person" in §3729—then there would be *absolutely no one left* to be a "person" under §3729.[9] It is far more reasonable to assume that Congress simply saw no need to add a definition of "person" in §3729 because (as both the legislative history, see *supra,* at 791–795, and the definitions in the CID provisions demonstrate) the meaning of the term "person" was already well understood. Congress likely thought it unnecessary to include a definition in §3729 itself.

The Court also relies on the definition of "person" in a separate, but similar, statute, the Program Fraud Civil Remedies Act of 1986 (PFCRA). *Ante,* at 786. The definition of "person" found in that law includes "any individual, partnership, corporation, association, or private organization." 31 U. S. C. §3801(a)(6). It is first worth pointing out the obvious: Although the PFCRA sits next to the FCA in the United States Code, they are separate statutes. It is therefore not altogether clear why the former has much bearing on the latter.[10] Regardless, the Court's whole argument

---

[9] Not so, the Court says, because natural persons and other entities, unlike States, are *presumed* to be included within the term "person." *Ante,* at 784, n. 14. In other words, this supposedly independent textual argument does nothing on its own without relying entirely on the presumption already discussed. See *supra,* at 797–798; *ante,* at 780–784. The negative inference adds nothing on its own.

[10] Indeed, reliance on the PFCRA seems to contradict the Court's central premise—that in 1863 the word "person" did not include States and that scattered intervening amendments have done nothing to change that. *Ante,* at 781–782. If that were so, the relevant meaning of the word

about the PFCRA rests entirely on the premise that its definition of "person" does not include States. That premise, in turn, relies upon the fact that § 3801(a)(6) in the PFCRA defines a "person" to include "any individual, partnership, corporation, association, or private organization," but does not mention States. We have, however, interpreted similar definitions of "person," which included corporations, partnerships, and associations, to include States as well, even though States were not expressly mentioned in the statutory definition. See *California* v. *United States*, 320 U. S., at 585; *Georgia* v. *Evans*, 316 U. S., at 160. (I draw no definitive conclusions as to whether States are subject to suit under the PFCRA; I only mean to suggest that the Court's premise is not as obvious as it presumes it to be.) In any event, the ultimate relevant question is whether the text and legislative history *of the FCA* make it clear that § 3729's use of the word "person" includes States. Because they do, nothing in any other piece of legislation narrows the meaning of that term.

Finally, the Court relies on the fact that the current version of the FCA includes a treble damages remedy that is "essentially punitive in nature." *Ante*, at 784. Citing *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 262–263 (1981), the Court invokes the "presumption against imposition of punitive damages on governmental entities." *Ante*, at 785. But as *Newport* explains, "courts vie[w] punitive damages [against governmental bodies] as contrary to sound public policy, because such awards would burden the very tax-

---

"person" would be the meaning adopted by the 1863 Congress, not the 1986 Congress. And on that premise, why should it matter what a different Congress, in a different century, did in a separate statute? Of course, as described earlier, see n. 5, *supra*, I believe it is the 1986 Congress' understanding of the word "person" that controls, because it is that word *as enacted by the 1986 Congress* that we are interpreting in this case. But on the Court's premise, it is the 1863 Congress' understanding that controls and the PFCRA should be irrelevant.

payers and citizens for whose benefit the wrongdoer was being chastised." 453 U. S., at 263. That rationale is inapplicable here. The taxpaying "citizens for whose benefit" the FCA is designed are the citizens of the United States, not the citizens of any individual State that might violate the Act. It is true, of course, that the taxpayers of a State that violates the FCA will ultimately bear the burden of paying the treble damages. It is not the coffers of the State (and hence state taxpayers), however, that the FCA is designed to protect, but the coffers of the National Government (and hence the federal taxpayers). Accordingly, a treble damages remedy against a State does not "burden the very taxpayers" the statute was designed to protect.[11]

## III

Each of the constitutional issues identified in the Court's opinion requires only a brief comment. The historical evidence summarized by the Court, *ante*, at 774–778, is obviously sufficient to demonstrate that *qui tam* actions are "cases" or "controversies" within the meaning of Article III. That evidence, together with the evidence that private prosecutions were commonplace in the 19th century, see *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 127–128, and nn. 24–25 (1998) (STEVENS, J., concurring in judgment), is also sufficient to resolve the Article II question that the Court has introduced *sua sponte*, *ante*, at 778, n. 8.

As for the State's "Eleventh Amendment" sovereign immunity defense, I adhere to the view that *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996), was wrongly decided. See *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 97–99 (2000) (STEVENS, J., dissenting); *Seminole Tribe*, 517 U. S., at 100–185 (SOUTER, J., dissenting). Accordingly, Congress' clear intention to subject States to *qui tam* actions is also

---

[11] It is also worth mentioning that treble damages may be reduced to double damages if the court makes the requisite findings under §§ 3729(a)(7)(A)–(C).

sufficient to abrogate any common-law defense of sovereign immunity. Moreover, even if one accepts *Seminole Tribe* as controlling, the State's immunity claim would still fail. Given the facts that (1) respondent is, in effect, suing as an assignee of the United States, *ante*, at 773; (2) the Eleventh Amendment does not provide the States with a defense to claims asserted by the United States, see, *e. g., United States* v. *Mississippi*, 380 U. S. 128, 140 (1965) ("[N]othing in [the Eleventh Amendment] or any other provision of the Constitution prevents or has ever been seriously supposed to prevent a State's being sued by the United States"); and (3) the Attorney General retains significant control over a relator's action, see 162 F. 3d, at 199–201 (case below), the Court of Appeals correctly affirmed the District Court's order denying petitioner's motion to dismiss. Compare *New Hampshire* v. *Louisiana*, 108 U. S. 76 (1883), with *South Dakota* v. *North Carolina*, 192 U. S. 286 (1904).[12]   I would, accordingly, affirm the judgment of the Court of Appeals.

---

[12] The agency argues that this is essentially an "end run" around the Eleventh Amendment. Brief for Petitioner 33. It is not at all clear to me, though, why a *qui tam* action would be considered an "end run" around that Amendment, yet precisely the same form of action is not an "end run" around Articles II and III.