IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-837

No. COA21-671

Filed 20 December 2022

Wake County, No. 14 CVS 13514

NORTH CAROLINA, *ex rel.* EXPERT DISCOVERY, LLC, BRINGING THIS ACTION ON BEHALF OF THE STATE OF NORTH CAROLINA, Plaintiff,

v.

AT&T CORP.; BELLSOUTH COMMUNICATION SYSTEMS, LLC; TELEPORT COMMUNICATIONS AMERICA, LLC; BELLSOUTH TELECOMMUNICATIONS, LLC; CAROLINA TELEPHONE AND TELEGRAPH COMPANY, LLC; CENTRAL TELEPHONE COMPANY; CENTURYLINK COMMUNICATIONS, LLC; MEBTEL, INC.; LEVEL 3 COMMUNICATIONS, LLC; TELCOVE OPERATIONS, LLC; TW TELECOM OF NORTH CAROLINA, L.P.; GLOBAL CROSSING LOCAL SERVICES, INC.; TIME WARNER CABLE INFORMATION SERVICES (NORTH CAROLINA), LLC; FRONTIER COMMUNICATIONS ONLINE AND LONG DISTANCE INC.; GLOBAL CROSSING TELECOMMUNICATIONS, INC. (FORMERLY D/B/A FRONTIER COMMUNICATIONS SERVICES INC.); CITIZENS TELEPHONE COMPANY; MCIMETRO ACCESS TRANSMISSION SERVICES CORP.; VERIZON SOUTH, INC.; NORTH STATE COMMUNICATIONS, LLC.; CHARTER COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS (NC), LLC; CHARTER FIBERLINK NC-CCO, LLC; and YMAX COMMUNICATIONS CORP., Defendants.

Appeal by Plaintiff from an order entered 19 April 2021 by Judge Stephan R. Futrell in Wake County Superior Court. Heard in the Court of Appeals 25 May 2022.

*FOX ROTHSCHILD LLP, by Robert H. Edmunds, Jr. and Kip D. Nelson; HIGGINS BENJAMIN, PLLC, by Robert N. Hunter, Jr. and Robert G. McIver; and RABON LAW FIRM, PLLC, by Charles H. Rabon, Jr., for Plaintiff-Appellant.*

*KILPATRICK TOWNSEND & STOCKTON LLP, by Joseph S. Dowdy; KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., by Scott H. Angstreich,* pro hac vice*; PARKER POE ADAMS & BERNSTEIN LLP, by Richard S. Glaser, Jr. and Nana Asante-Smith*; BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, LLP, *by Jim W. Phillips, Jr. and Kimberly M. Marston; BURNS, DAY & PRESNELL, P.A., by Daniel C. Higgins; MORGAN LEWIS & BOCKIUS LLP, by Michael Muller; and*

*ROBINSON, BRADSHAW & HINSON, P.A., by Gregory L. Skidmore and Fitz E. Barringer, for the Defendants-Appellees.*

WOOD, Judge.

¶ 1 Expert Discovery, LLC ("Plaintiff") appeals from the order granting "Defendants' Joint Motion to Dismiss for Failure to State a Claim under N.C. Gen. Stat. 1A-1, Rule 12(b)(6)" and denying "the 2016 Defendants' Motion to Dismiss for Failure to State a Claim and Lack of Subject Matter Jurisdiction under N.C. Gen. Stat. 1A-1, Rule 12(b)(6) and 12(b)(1)." For the reasons stated below, we affirm in part and reverse in part the trial court's order.

## I. Factual and Procedural Background

¶ 2 During an emergency, North Carolina's 911 system connects individuals to Police, Fire, and Emergency Medical Services public resources, and a state agency, the 911 Board, oversees it. North Carolina funds its 911 system services by service charges levied on telephone customers. In 1989, our General Assembly enacted a 911 statute to fund North Carolina's 911 system which permitted cities and counties to impose a monthly "911 charge" on each outgoing local telephone access line. 1989 N.C. Sess. Law 587, § 62A-4(a). This statute requires telephone service providers in each local area to collect and remit the service charges monthly to the 911 Board. *Id.,* § 62A-5, -6. The 911 Board then distributes the collected 911 funds to the State's many 911 call centers.

¶ 3 Since 1989, North Carolina's 911 statute has undergone several revisions. In 2007, the General Assembly revised it to impose a single, statewide 911 service charge that applied uniformly to all types of voice communications services, including wireless and Voice over Internet Protocol ("VoIP"). The "911 charge" was imposed "on each active voice communications service connection . . . *capable of accessing the 911 system*." An Act to Modernize and Improve the Administration of the State's 911 System Through a Statewide 911 Board, by Ensuring that all Voice Services Contribute to the 911 System and by Providing Parity in the Quality of Service and the Level of 911 Charges Across Voice Communications Service Providers, 2007 N.C. Sess. Law 383, § 1(a) ("H.B. 1755"). A "[v]oice communications service connection" is defined to include "[e]ach telephone number assigned to a residential or commercial subscriber by a voice communications service provider, without regard to technology deployed." *Id.*, § 62A-40(21). In 2015, the General Assembly revised the 911 statute, so that a 911 service charge was "imposed on each active communications service connection that *provides access to the 911 system* through a voice communications service." 2015 N.C. Sess. Law 261, § 4(c) ("H.B. 730").

¶ 4 In 2018, the General Assembly again amended the 911 statute through two separate bills enacted within weeks of each other. In the first bill titled, "Current Operations Appropriations Act of 2018," our legislators addressed a section of N.C. Gen. Stat. § 143B-1403. The bill stated:

SECTION 37.4(a) [N.C. Gen. Stat. §] 143B-1403(a) reads as rewritten:

§ 143B-1403. Service charge for 911 service.

(a) Charge Imposed. - A monthly 911 service charge is imposed on each active communications service connection that provides access to the 911 system through a voice communications service. The service charge for service other than prepaid wireless telecommunications service is seventy cents (70[cents]) or a lower amount set by the 911 Board under subsection (d) of this section. The service charge is payable by the subscriber to the provider of the voice communications service. The provider may list the service charge separately from other charges on the bill. Partial payments made by a subscriber are applied first to the amount the subscriber owes the provider for the voice communications service. <u>If a subscriber is capable of making more than one simultaneous outbound 911 call though its communications service connections, then the total number of 911 service charges billed to the subscriber shall be (i) for CMRS providers, an amount equal to the number of CMRS connections and (ii) for all other communications service providers, an amount equal to the total number of simultaneous outbound 911 calls the subscriber can make using the North Carolina telephone numbers or trunks billed to their account.</u>

2018 N.C. Sess. Law 5, § 37.4(a) ("S.B. 99") (emphasis supplied to indicate proposed added text). Thus, S.B. 99 added language that explained how 911 charges should be calculated when a customer "is capable of making more than one simultaneous outbound 911 call through its communications service connections." *Id.*

Further, the General Assembly provided relief from liability for providers and customers with earlier billing practices that may have departed from the above-

mentioned rule:

> SECTION 37.4(b) For any services for which a bill is rendered prior to 180 days following the effective date of this section, no subscriber or communications service provider shall be liable to any person or entity for billing or remitting a different number of 911 service charges than is required by Part 10 of Article 15 of Chapter 143B of the General Statutes.

*Id.* § 37.4(b). A few weeks later, the General Assembly produced another bill, titled "An Act to Make Technical, Clarifying, and other Modifications to the Current Operations Appropriations Act of 2018 and to Create the Legislative Commission on the Fair Treatment of College Student-Athletes." 2018 N.C. Sess. Law 97 ("S.B. 335"). In this latter bill, the General Assembly again addressed the 911 Act. S.B. 335 stated:

> SECTION 10.3. If Senate Bill 99, 2017 Regular Session, becomes law, then Section 37.4(b), as enacted by that act, reads as rewritten:
>
> SECTION 37.4(b) For any services for which a bill is <u>or has been</u> rendered <u>at any time</u> prior to 180 days following the effective date of this section, <u>whether under [N.C. Gen. Stat. §] 143B-1403 or its predecessors as previously codified,</u> no subscriber or communications service provider shall be liable to any person or entity for billing or remitting a different number of 911 service charges than is required by Part 10 of Article 15 of Chapter 143B of the General ~~Statutes~~ <u>Statutes, as clarified by subsection (a) of this section. Subsection (a) of this section is intended as a clarification of existing law</u>.

*Id.*, § 10.3 (emphasis supplied to indicate proposed added text). On 12 June 2018, the

"Current Operations Appropriations Act of 2018" was enacted. The latter bill, which made "Technical, Clarifying, and other Modifications to the Current Operations Appropriations Act of 2018," was enacted on 26 June 2018.

¶ 6 Expert Discovery, LLC is a limited liability company organized and operating under the laws of Alabama, with its principal place of business in Huntsville, Alabama. Its president, Roger Schneider, purports to have thirty-five years of experience with high profile technology and telecommunication initiatives. Mr. Schneider has organized and utilized other entities across the country in order to bring suit against telecommunication providers for alleged underbilling for 911 service charges.

¶ 7 In October 2014, Plaintiff, on behalf of the State of North Carolina, filed a *qui tam* complaint[1] under seal pursuant to N.C. Gen. Stat. § 1-605, North Carolina's False Claims Act. Plaintiff alleged several telecommunication companies "that provide voice communication services within the State of North Carolina" ("Defendants") had "violated the North Carolina False Claims Act by knowingly failing to adequately remit monthly 911 service charges to the State of North Carolina." Plaintiff argued

---

[1] "*Qui tam* actions are those 'brought *under a statute* that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive.'" *Fuller v. Easley*, 145 N.C. App. 391, 397, 553 S.E.2d 43, 47 (2001) (emphasis in original) (quoting *Qui tam action*, Black's Law Dictionary (7th ed. 1998)).

that (1) North Carolina's 911 statute required that the prescribed monthly 911 service charge "[be] imposed on *each telephone* number—as opposed to the number of phone lines"; (2) the legislation places the responsibility for collecting and remitting the 911 surcharges upon the telecommunication companies; and (3) "Defendants routinely do not charge the correct amount of 911 service charges or do not charge 911 service charges at all" because "rather than charging 911 fees by telephone *number,* many of the Defendants instead are routinely charging 911 fees by the number of *lines*, particularly when the number of telephone numbers is greater than the number of lines." Plaintiff contended that this practice results in significant under-payment of 911 service charge fees to the State and thereby harms the State of North Carolina, "its citizens, and other subscribers who are forced to pay more than their fair share to support and sustain the 911 System." In 2014, Plaintiff's first complaint, named five companies as Defendants and 10 "yet-to-be-identified" "fictitiously named corporations." At the time Plaintiff filed its first complaint, Mr. Schneider controlled entities having seven pending "false claims" actions in other states.

¶ 8 On 5 August 2016, Plaintiff amended its complaint to add additional Defendants and to "reflect the most significant evidence gathered to date" to further support its allegations against Defendants. Plaintiff argued that its research and analysis demonstrate that "Defendants' under-collection and under-remittance of 911

service charges is widespread and systemic and is not limited to certain service providers, to certain subscribers, or to certain periods of time." On 20 March 2020, Plaintiff amended its complaint a second time, alleging that "Defendants knowingly and routinely under-billed and under-remitted the 911 service charges required by law between 2008 and 2018 within the State of North Carolina." Again, Plaintiff alleged that Defendants "did not assess or remit one charge per telephone number capable of accessing 911 for their multi-line business customers" and for VoIP service and that Defendants "assessed and remitted one 911 charge for the number of calls a customer could place simultaneously," instead of by charging for each individual telephone number as required by statute. Plaintiff argued that Defendants billed their customers fewer charges than would be due if charges were billed based on those customers' assigned telephone numbers.

¶ 9        On 3 June 2020, the State of North Carolina notified the trial court it was declining to take over Plaintiff's *qui tam* action "at this time," referred the court to N.C. Gen. Stat. § 1-609(f) and noted that "the action may be dismissed only if the court and Attorney General have given written consent to the dismissal and the reasons for consenting." The State requested (1) that the case be unsealed and (2) the court "solicit the written consent of the State . . . before ruling or granting its approval," if either party proposed that "this action or any claims therein be dismissed, settled, or otherwise discontinued." On 24 June 2020, the trial court

entered an order to unseal Plaintiff's second amended complaint and the State's notice declining to take over the action. The trial court further ordered that "[s]hould the *qui tam* Plaintiff or the Defendants propose that this action or any claims be dismissed, settled, or otherwise discontinued, the Court will solicit the written consent of the State of North Carolina before ruling or granting its approval."

¶ 10    On 7 August 2020, Plaintiff filed a notice of voluntary dismissal of its claims against Defendants of the Frontier parent company and its subsidiaries.[2] On or about 24 August 2020, the State consented to the dismissal of these Defendants. On 2 October 2020, the remaining Defendants filed a Consent Motion to designate the case as Exceptional under Rule 2.1 of the General Rules of Practice, and on 18 November 2020, Chief Justice Beasley designated the case as Exceptional and appointed Judge Futrell to preside.

¶ 11    In January 2021, Defendants filed two motions to dismiss Plaintiff's second amended complaint. The first motion ("Joint Motion") was brought pursuant to Rule 12(b)(6). The Joint Motion raised five grounds for dismissal of Plaintiff's second amended complaint: (1) the 2018 Amendment to North Carolina's 911 statute expressly released the State's claims Plaintiff sought to bring on its behalf; (2)

---

[2] We note that Defendants' motion explained Plaintiff filed a notice of voluntary dismissal of its claims against Frontier Communications of America, Inc., Frontier Communications of the Carolinas, LLC, Frontier Communications Online and Long Distance Inc., and Global Crossing Telecommunications, Inc. on or about 7 August 2020.

pending suits alleged similar violations of the relevant state or local False Claims Act and triggered provision of the first-to-file bar under the North Carolina False Claims Act; (3) Plaintiff's complaint failed to state a claim under the Act; (4) the complaint alleged that Defendants complied with the 911 statute as clarified by the General Assembly; and (5) any claims concerning acts transpiring before 1 January 2010 should be dismissed because they preceded the North Carolina False Claims Act's effective date.

¶ 12        A smaller group of Defendants, including ten who were newly added in 2016, ("2016 Defendants") filed a separate motion to dismiss under Rules 12(b)(1) and 12(b)(6). This motion stated that the newly added Defendants also "join[ed]" the Joint Motion, which they "incorporated" into their own motion "in full." With respect to their Rule 12(b)(1) motion, the 2016 Defendants argued Plaintiff previously engaged in 911 statute litigation across the country, which was highly publicized. Due to news coverage of Plaintiff's previous litigation efforts in other states, the 2016 Defendants contended that Plaintiff's current claims were based on public disclosures, so that Plaintiff did not qualify as the original source of these disclosures. According to the 2016 Defendants, the public disclosure bar in North Carolina's False Claims Act prevented the trial court from possessing subject matter jurisdiction over Plaintiff's claims, such that the claims should be dismissed in their entirety.

¶ 13        On 29 March 2021, the trial court conducted a hearing on the Defendants'

motions, and by order entered 19 April 2021, dismissed Plaintiff's complaint for lack of subject matter jurisdiction. The trial court concluded that Defendants' Joint Motion regarding the first-to-file bar "is substantively jurisdictional despite its label as a 12(b)(6) motion" and "treat[ed] it as a Rule 12(b)(1) motion." The trial court also ruled that the North Carolina False Claims Act's "first-to-file bar removes subject matter jurisdiction from this [trial court] due to the earlier-filed actions in other jurisdictions that allege the same material elements of fraud." The trial court further determined that dismissal of Plaintiff's complaint was also warranted because "in laws enacted in 2018, the General Assembly expressly declared that Defendants would not be liable for the under-billing and under-remitting of 911 charges as alleged in Plaintiff-Relator's complaint." Although the trial court denied the 2016 Defendants' motion to dismiss for failure to state a claim and lack of subject matter jurisdiction, the trial court held that, in the alternative, if the "first-to-file bar did not remove this Court's jurisdiction, Defendants' Joint Motion to Dismiss for Failure to State a Claim is granted, and Plaintiff-Relator's [c]omplaint is hereby dismissed with prejudice." Plaintiff filed notice of appeal on 17 May 2021.

## II. Analysis

### A. Petition for Writ of Certiorari

Plaintiff filed a conditional petition for writ of certiorari due to a defect in the service of its notice of appeal on all Defendants to the action, and as a precaution

should its appeal be considered interlocutory.[3]  Plaintiff's counsel filed a notice of appeal of the 19 April 2021 order on 17 May 2021; however, the notice was not mailed to all Defendants' counsels at that time.  According to Defendants, counsel for AT&T, North State, and Citizens did not receive service or actual notice of the appeal within the 30-day period, pursuant to Rule 3 of the North Carolina Rules of Appellate Procedure.  *See* N.C. R. App. P. 3(c)(1).  On 16 June 2021, those Defendants who had not been properly served moved to dismiss the appeal.  The remaining Defendants also moved to dismiss the appeal based on Plaintiff's failure to comply with Rule 3 on 23 June 2021.  During the interim, Plaintiff obtained an extension of time to settle the record of appeal.  On 21 July 2021, the trial court denied Defendants' joint motions to dismiss based on the factors test in *Dogwood Development & Management Co. v. White Oak Transportation Co.* 362 N.C. 191, 657 S.E.2d 361 (2008).  It is clear that Defendants did not appeal the trial court's denial of these motions.  The record further reflects Defendants filed their response to Plaintiff's petition for writ of certiorari on 23 March 2022, the same day they filed their brief with this Court.

¶ 15        Plaintiff's petition for writ of certiorari contends that its service error is non-jurisdictional and does not constitute a basis for dismissal of its appeal.  " '[R]ules of

---

[3] We take judicial notice that at oral argument before this Court, counsel for the parties clarified that there are no pending claims as to this action before the trial court. Therefore, this appeal is not interlocutory.

procedure are necessary . . . in order to enable the courts properly to discharge their dut[y]' of resolving disputes." *Id*. at 193, 657 S.E.2d at 362 (quoting *Pruitt v. Wood*, 199 N.C. 788, 790, 156 S.E. 126, 127 (1930)). However, "noncompliance with the appellate rules does not, ipso facto, mandate dismissal of an appeal . . . . Whether and how a court may excuse noncompliance with the rules depends on the nature of the default." *Id*. at 194, 657 S.E.2d at 363 (internal citation omitted).

¶ 16     Rule 3 of our Rules of Appellate Procedure provides that

> [a]ny party entitled by law to appeal from a judgment or order of a superior or district court rendered in a civil action or special proceeding may take appeal by filing notice of appeal with the clerk of superior court and serving copies thereof upon *all other parties* within the time prescribed by subdivision (c) of this rule.

N.C. R. App. P. 3(a) (emphasis added). Hence, the plain language of Rule 3(a) provides that "all other parties" must be served with a copy of the notice of appeal. N.C. R. App. P. 3(a). The record reflects Plaintiff failed to comply with Rule 3 and that Defendants objected and requested dismissal of Plaintiff's appeal, so as not to waive the lack of service. Therefore, we consider whether the appeal must be dismissed pursuant to the factors in *Dogwood*. *See Lee v. Winget Rd., LLC,* 204 N.C. App. 96, 102, 693 S.E.2d 684, 689 (2010).

¶ 17     If failure to comply with Rule 3 creates "[a] jurisdictional default[,]" we are required "to dismiss the appeal." *Dogwood Dev. & Mgmt. Co.,* 362 N.C. at 197, 657

S.E.2d at 365. However, "[i]t is the *filing* of the notice of appeal that confers jurisdiction upon this Court, not the *service* of the notice of appeal." *State v. Golder*, 257 N.C. App. 803, 804, 809 S.E.2d 502, 504 (2018) (citation omitted), *aff'd as modified* 374 N.C. 238, 839 S.E.2d 782 (2020). In *Lee*, this Court noted that where a notice of appeal is properly and timely filed, but not served upon *all* parties, this violation of Rule 3 is a non-jurisdictional defect. 204 N.C. App. 96, 102, 693 S.E.2d 684, 689 (2010).

¶ 18        *Dogwood* held that a non-jurisdictional failure to comply with appellate rules "normally should not lead to dismissal of the appeal." *Dogwood Dev. & Mgmt. Co.,* 362 N.C. at 198, 657 S.E.2d at 365 (citations omitted). Neither should dismissal be considered unless the noncompliance is a "substantial failure" to comply with the rules or a "gross violation" of the rules. *Id.* at 199, 657 S.E.2d at 366. This Court is required to make a "fact-specific inquiry into the particular circumstances of each case," mindful of the need to enforce the rules as uniformly as possible. *Id.* at 199-200, 657 S.E.2d at 366 (citations omitted). Dismissal is appropriate only for the "most egregious instances of non-jurisdictional default." *Id.* at 200, 657 S.E.2d at 366 (citations omitted). To determine the severity of an appellate rule violation, this Court considers: "[(1)] whether and to what extent the noncompliance impairs the court's task of review[, (2)] . . . whether and to what extent review on the merits would

frustrate the adversarial process . . . . [, and (3)] [t]he court may also consider the number of rules violated." *Id.* at 200, 657 S.E.2d at 366-67 (citations omitted).

¶ 19    Looking to this Court's analysis in *State v. Jenkins* and its application of *Dogwood,* our review is not impaired by Defendant's noncompliance with Rule 3(a). *State v. Jenkins,* 273 N.C. App. 145, 150, 848 S.E.2d 245, 249 (2020). As in *Jenkins,* the position of the parties on appeal is known by the timely filing of their briefs with this Court. We hold Plaintiff's violation of Rule 3 did not frustrate the adversarial process. *Id.* at 150, 848 S.E.2d at 249. Further, this case is distinguishable from *Lee,* as the unserved defendants were later "informed of the fact that there was an appeal which affect[ed] their interests." *Lee,* 204 N.C. App. at 103, 693 S.E.2d at 690. While some Defendants initially were not served with the notice of appeal, these Defendants were informed of it and were able to timely respond by filing and serving a joint motion to dismiss the appeal on 16 June 2021. Therefore, Plaintiff's conditional petition for writ of certiorari is granted.

**B. Standard of Review**

¶ 20    When reviewing a trial court's ruling on a Rule 12 dismissal, this Court reviews the matter *de novo. Suarez ex rel. Nordan v. Am. Ramp Co.*, 266 N.C. App. 604, 610, 831 S.E.2d 885, 890 (2019). In determining whether a trial court correctly decided to dismiss a complaint for failure to state a claim pursuant to Rule 12(b)(6), we examine "whether the allegations of the complaint, if treated as true, are sufficient to state a

claim upon which relief can be granted under some legal theory." *Bridges v. Parrish*, 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013) (citation omitted). In conducting the required analysis, "the allegations of the complaint must be viewed as admitted, and on that basis the court must determine as a matter of law whether the allegations state a claim for which relief may be granted." *Davis v. Hulsing Enters., LLC*, 370 N.C. 455, 457, 810 S.E.2d 203, 205 (2018) (citation omitted). Our Supreme Court has long held "it is clear that judicial notice can be used in rulings on . . . motions to dismiss for failure to state a claim." *Wood v. J. P. Stevens & Co.*, 297 N.C. 636, 641, 256 S.E.2d 692, 696 (1979). Additionally, a motion to dismiss for lack of subject-matter jurisdiction is not viewed in the same manner as a motion to dismiss for failure to state a claim upon which relief can be granted. In such cases, matters outside the pleadings may be considered and weighed by the court in determining the existence of jurisdiction. *Tart v. Walker,* 38 N.C. App. 500, 502, 248 S.E.2d 736, 737 (1978).

**C. The North Carolina False Claims Act and the First-to-File Rule.**

Plaintiff first argues that the trial court erred in granting Defendants' motion to dismiss because the False Claims Act's "first-to-file bar removes subject matter jurisdiction" from the trial court. Plaintiff contends the trial court erred in dismissing its action because the first-to-file rule is not jurisdictional and does not apply to actions brought under different state statutes, as none of the other *qui tam* actions

were served on the State of North Carolina. We agree.

¶ 22 The North Carolina False Claims Act was created "to ensure that public funds are spent in the manner for which they were intended instead of being misappropriated, misspent, or misused." *State ex rel. Stein v. Kinston Charter Acad.*, 379 N.C. 560, 2021-NCSC-163, ¶ 43. North Carolina's False Claims Act creates an incentive for private actors with actual knowledge of fraudulent behavior to bring what are known as "*qui tam*" actions, by which the relator (that is, the private actor) shares in any recovery if it or the government successfully litigates or settles a claim that the relator initially brought. N.C. Gen. Stat. § 1-610 (2014). The purpose of the *qui tam* action is to expose "fraud that the government itself cannot easily uncover by encouraging private parties to report fraudulent conduct." *Mason v. Health Mgmt. Assocs., LLC*, 421 F. Supp. 3d 237, 243 (W.D.N.C. 2019) (citation omitted). Accordingly, any "person" who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval" or who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" shall be "liable to the State for three times the amount of damages that the State sustains because of the act of that person." N.C. Gen. Stat. § 1-607(a)(1)-(2) (2014).

¶ 23 Although the North Carolina False Claims Act was not enacted until 2009, *qui tam* practice has long been supported by the public policy of this State. *See, e.g.*,

*Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 2021-NCSC-6, ¶¶ 26-27, 33 (noting that "relator" actions have long been a part of North Carolina practice); *State v. Maultsby*, 139 N.C. 583, 584, 51 S.E. 956, 956 (1905) (explaining that the "legislative power to authorize *qui tam* actions" is "immemorial"). Further, our Supreme Court delineated that our state's False Claims Act is required to be "read consistently with the federal False Claims Act." *State ex rel. Stein*, ¶ 39. Like the federal False Claims Act, North Carolina's False Claims Act contains provisions "to prevent parasitic lawsuits based on previously disclosed fraud," including the "first-to-file" bar. *United States ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 39 (4th Cir. 2016). The first-to-file bar precludes another relator's suit "if there is already a separate, pending lawsuit that involves related claims." *United States ex rel. Banigan v. PharMerica, Inc.*, 950 F.3d 134, 142 n.8 (1st Cir. 2020).

As of 2014, our State's first-to-file bar statute outlined:

> When a person brings an action under this subsection, the federal False Claims Act, 31 U.S.C. § 3729 et seq., or any similar provision of law in any other state, no person other than the State may intervene or bring a related action based on the facts underlying the pending action; provided, however, that nothing in this subdivision prohibits a person from amending a pending action in another jurisdiction to allege a claim under this subsection.

N.C. Gen. Stat. § 1-608(b)(5) (2014). When a case triggers the first-to-file bar, the later-filed case must be dismissed, rather than stayed. Once all earlier-filed cases

conclude, the first-to-file bar will not prevent the re-filing of the dismissed claims as new actions. *See, e.g.*, *United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 928-30 (D.C. Cir. 2017). Consequently, the first-to-file bar does not require the exact same facts to be alleged in the later-filed case. Rather, this court must determine "whether the [subsequent complaint] alleges a fraudulent scheme the government already would be equipped to investigate based on the [prior complaint.]" *United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011).

¶ 25 Neither North Carolina's legislature nor courts have yet answered the question of whether a first-to-file claim is jurisdictional. Generally, federal courts have held first-to-file claims under the federal False Claims Act are *non*-jurisdictional. *In re Plavix Mktg., Sales Pracs. & Prods. Liab. Litig.*, 974 F.3d 228, 232 (3d Cir. 2020); *United States ex rel. Hanks v. United States*, 961 F.3d 131, 137 (2d Cir. 2020). We need not determine today the jurisdictional nature of first-to-file claims in North Carolina because we conclude the first-to-file rule is inapplicable to the case *sub judice*.

¶ 26 While we may take judicial notice of exhibits within the record that are pertinent to Mr. Schneider's pending cases across the country,[4] the first-to-file rule

---

[4] For example, when Plaintiff filed this case in October 2014, affiliates of Plaintiff previously had filed seven cases alleging that telephone service companies failed to bill

does not serve as a bar to claims, "based on different material facts" and "separate regulations." *United States ex rel. Hartpence v. Kinetic Concepts, Inc.,* 792 F.3d 1121, 1131 (9th Cir. 2015). Although Plaintiff's complaints, both here and in other states, allege claims under various states' False Claims Acts, the underlying allegations of fraud in the complaints do not, in fact, allege violations under the same statutes. Because these claims are based on "separate regulations," the first-to-file rule does not serve as a bar to the action before us. *Id.* Plaintiff argues Defendants violated *North Carolina* law by failing to collect and remit the proper amount of 911 service fees owed to the *North Carolina* 911 Board. There are no identical lawsuits to Plaintiff's claim, as none of the other pending complaints have asserted a claim under

---

their customers all 911 charges owed, and thereby violated the relevant state or local False Claims Act. These cases are as follows:

New Jersey*: New Jersey ex rel. Phone Recovery Servs., LLC v. Verizon New Jersey, Inc.*, No. L-2257-13 (Mercer Cnty. Super. Ct.). Initial complaint filed in October 2013.

Massachusetts: *Massachusetts ex rel. Phone Recovery Servs., LLC v. Verizon of New England, Inc.*, No. 15-00783-BLSI (Suffolk Cnty. Super. Ct.). Initial complaint filed in January 2014.

New York: *New York ex rel. Phone Admin. Servs. Inc. v. Verizon New York Inc.*, No. 100329/2014 (Sup. Ct., N.Y. Cnty.). Initial complaint filed on 20 March 2014.

District of Columbia: *District of Columbia ex rel. Phone Recovery Servs., LLC v. Verizon Washington DC, Inc.,* No. 14-0002277 (D.C. Super. Ct.). Initial complaint filed in April 2014.

Illinois: *Illinois ex rel. Phone Recovery Servs. of Illinois, LLC v. Ameritech Illinois Metro, Inc.*, No. 14-L-5238 (Cook Cnty. Cir. Ct.), *on remand* No. 19-L-6803. Initial complaint filed in May 2014.

Minnesota: *Minnesota ex rel. Phone Recovery Servs., LLC v. CenturyLink, Inc.*, No. 62-CV-14-3768 (Ramsey Cnty. Dist. Ct.). Initial complaint filed in May 2014.

Iowa: *Iowa ex rel. Phone Recovery Servs. v. AT&T Inc.*, No. CVCV047928 (Polk Cnty. Dist. Ct.). Initial petition filed in May 2014.

*North Carolina's* False Claims Act. A false claims action in North Carolina based on a violation of North Carolina's 911 statute is not barred by a pending false claims action in Iowa brought under Iowa's law. Indeed, claims are not barred when they "exist completely independent of one another." *Id.*

¶ 27 Additionally, one purpose of the first-to-file rule is "to give preclusive effect to the *qui tam* action that presented enough material information for the government to launch an investigation." *United States ex rel. Lee v. N. Adult Daily Health Care Ctr.,* 174 F. Supp. 3d 696, 705 (E.D.N.Y. 2016). The first-to-file bar provides an incentive to relators to "promptly alert the government to the essential facts of a fraudulent scheme." *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 24 (1st Cir. 2009) (cleaned up). Here, none of the other pending *qui tam* actions cited by Defendants were served on the State of North Carolina. North Carolina was never alerted to or placed on notice of any fraudulent schemes committed against it by these previous, out of state, complaints. Plaintiff asserts North Carolina government is not "solely responsible for monitoring every piece of litigation in every state—even if that litigation were under seal. The law makes no such absurd demand." We agree and therefore hold that the first-to-file rule does not apply to the facts of this case, as out-of-state claims do not place the State of North Carolina on notice of the type of fraudulent scheme that Plaintiff has alleged. *See United States ex rel. Harris v. Lockheed Martin Corp.*, 905 F. Supp. 2d 1343, 1350

(N.D. Ga. 2012).

**D. Retroactive Application of Legislation.**

Next, Plaintiff contends that the trial court incorrectly concluded Plaintiff's complaint failed to state a claim because "in laws enacted in 2018," "the General Assembly expressly declared that Defendants would not be liable for the under-billing and under-remitting of 911 charges." Plaintiff argues the trial court's alternative basis for dismissing its second amended complaint was erroneous due to "a misreading of the [General Assembly's] 2018 legislation—a misreading with constitutional implications." We disagree.

The General Assembly enacted S.B. 99 in 2018, amending language in N.C. Gen. Stat. § 143B-1403(a) to provide that if a customer "is capable of making more than one simultaneous outbound 911 call through its communications service connections," then the total number of monthly 911 service charges billed to the customer is assessed by "an amount equal to the total number of simultaneous outbound 911 calls the subscriber can make using the North Carolina telephone numbers or trunks billed to their account." 2018 N.C. Sess. Law 5, § 37.4(a). Therefore, monthly 911 service charges would not be assessed on a per-telephone-number basis. Further, S.B. 335 provides additional clarification regarding the application of N.C. Gen. Stat. § 143B-1403(a). The enacted provision states:

> For any services for which a bill is <u>or has been</u> rendered <u>at</u>

any time prior to 180 days following the effective date of this section, whether under [N.C. Gen. Stat. §] 143B-1403 or its predecessors as previously codified, no subscriber or communications service provider shall be liable to any person or entity for billing or remitting a different number of 911 service charges than is required by Part 10 of Article 15 of Chapter 143B of the General ~~Statutes~~ Statutes, as clarified by subsection (a) of this section. Subsection (a) of this section is intended as a clarification of existing law.

2018 N.C. Sess. Law 97, § 10.3 (emphasis supplied to indicate added text).

¶ 30    Defendants argue that the above language in S.B. 335 applies retroactively, and that the immunity granted thereby forecloses Plaintiff's claim, irrespective of it having been filed prior to the statute taking effect. Plaintiff contends "the law does not support such a broad reach."

¶ 31    A retroactive law is one which "is made to affect acts or transactions occurring before it came into effect." *Ashley v. Brown*, 198 N.C. 369, 372, 151 S.E. 725, 727 (1930) (citation omitted). "[A] statute is presumed to have prospective effect only and should not be construed to have a retroactive application unless such an intent is clearly expressed or arises by necessary implication from the terms of the legislation." *State v. Green*, 350 N.C. 400, 404, 514 S.E.2d 724, 727 (1999) (citation omitted). "The primary endeavor of courts in construing a statute is to give effect to legislative intent." *State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 276-77 (2005) (citations omitted). A court ascertains legislative intent by looking "first to the language of the statute itself." *Fowler v. Valencourt*, 334 N.C. 345, 348, 435 S.E.2d

530, 532 (1993). Courts "will not adjudge an act of the General Assembly unconstitutional unless it is clearly so." *Hobbs v. Cty. of Moore*, 267 N.C. 665, 671, 149 S.E.2d 1, 5 (1966) (citation omitted); *Bolick v. Am. Barmag Corp.*, 306 N.C. 364, 371, 293 S.E.2d 415, 420 (1982) ("When a statute would have the effect of destroying a vested right if it were applied retroactively, it will be viewed as operating prospectively only." (citation omitted)). However, "[i]f the statutory language is clear and unambiguous, the court eschews statutory construction in favor of giving the words their plain and definite meaning." *Beck,* 359 N.C. at 614, 614 S.E.2d at 277 (citing *Fowler*, 334 N.C. at 348, 435 S.E.2d at 532). Where a statute's retroactive application is "clear beyond any reasonable doubt," the reviewing court must apply it retroactively or strike it as unconstitutional. *See Kornegay v. City of Goldsboro,* 180 N.C. 441, 445, 105 S.E. 187, 189 (1920).

¶ 32          Although S.B. 335 does not expressly state that the provision is to apply "retroactively," the bill utilizes the phrases "has been," "at any time," and "its predecessors as previously codified" to indicate the General Assembly's intention for the 911 service charges immunity to be applied to phone bills generated before the Act's enactment. It is clear that phone bills "rendered" under the 911 statute's "predecessors" would necessarily have been sent before the Act took effect in 2018. We also note that the General Assembly specifically added the underscored language to the initial version of S.B. 99, § 37.4(b) to ensure that immunity from 911 service

charges applied irrespective of when the service provider billed its customer (inserting "or has been" and "at any time"), and under both the current 911 statute and its past versions (adding "whether under" and "or its predecessors as previously codified"). Thus, the unambiguous language added to section 37.4(b) "clearly purports to apply retroactively to cases arising before and after the passage" of the 2018 legislation. *Wallace v. Greystar Real Estate Partners, LLC*, 2022 U.S. Dist. LEXIS 32760, at \*10 (M.D.N.C. Feb. 24, 2022) (unpublished). By its plain language, the 2018 session laws purport to apply retroactively to this case. Therefore, we must give effect to the 2018 legislation's plain meaning unless doing so would be unconstitutional.

¶ 33    Plaintiff contends that even if the legislation is arguably retroactive, its application to pending litigation would unconstitutionally infringe on its vested rights and impair its contractual rights. Specifically, Plaintiff argues that the False Claims Act "grants the relator status as an injured party and then assigns it the right to litigate the claim on behalf of the government," so that the "relator's contractual rights thus vest when it brings the claim." Moreover, Plaintiff alleges that by "bringing this action and making a jury demand," it invoked additional constitutional rights. Plaintiff's arguments are misplaced.

¶ 34    A statute will not be applied retroactively if it "will interfere with rights which had vested or liabilities which had accrued at the time it took effect." *Fogleman v.*

*D&J Equip. Rental, Inc.,* 111 N.C. App. 228, 232, 431 S.E.2d 849, 851 (1993) (citation omitted). A vested right is a right "which is otherwise secured, established, and immune from further legal metamorphosis." *Gardner v. Gardner*, 300 N.C. 715, 719, 268 S.E.2d 468, 471 (1980). Thus, "a lawfully entered judgment is a vested right." *Bowen v. Mabry*, 154 N.C. App. 734, 736, 572 S.E.2d 809, 811 (2002) (citing *Dellinger v. Bollinger*, 242 N.C. 696, 698, 89 S.E.2d 592, 593 (1955)).

¶ 35          Our Supreme Court has "recognized a presumption that a state statute 'is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.' " *N.C. Ass'n of Educators, Inc. v. State*, 368 N.C. 777, 786, 786 S.E.2d 255, 262 (2016) (quoting *Dodge v. Bd. of Educ.*, 302 U.S. 74, 79, 58 S. Ct. 98, 100, 82 L. Ed. 57, 62 (1937)). "This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state." *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 466, 105 S. Ct. 1441, 1451, 84 L. Ed. 432, 446 (1985) (citation omitted). Accordingly, "to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body." *Id.* Consistent with this presumption, our Supreme Court held that "[a] statute providing a penalty creates no contract between the State and the common informer, even if he acts under the permission given him to sue." *Dyer v.*

*Ellington,* 126 N.C. 941, 945, 36 S.E. 177, 178 (1900).

Such is the case here. Plaintiff is unable to carry its burden of overcoming this presumption as the North Carolina False Claims Act does not create a contractual right for a relator. A relator does not accept the State's offer by filing suit, and thereby enter into a unilateral contract with the government. While Plaintiff is correct that "a *qui tam* relator, is in effect, suing as a partial assignee" on behalf of a government, *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 n.4, 120 S. Ct. 1858, 1863, 146 L. Ed. 2d 836, 846 (2000), treating a *qui tam* provision as "a unilateral contract offer would also be inconsistent with the history of *qui tam* provisions." *Brooks v. Dunlop Mfg. Inc.,* 702 F.3d 624, 632 (Fed. Cir. 2012). As a Federal Circuit Court of Appeals has noted, "federal courts have consistently recognized that amendments to *qui tam* statutes that interfere with a relator's pending action do not 'deprive him of rights guaranteed by the Constitution.' " *Id.* (quoting *United State ex rel. Rodriguez v. Weekly Publ'n, Inc.*, 144 F.2d 186, 188 (2d Cir. 1944)). That is to say, "a *qui tam* plaintiff has no vested right and his privilege of conducting the suit on behalf of the United States and sharing in the proceeds of any judgment recovered, is an award of statutory creation, which, prior to final judgment, is wholly within the control of Congress." *Brooks*, 702 F.3d at 632 (cleaned up).

¶ 36    The Supreme Court of the United States also noted that a "*qui tam* relator has

suffered no such invasion [of a legally protected right]—indeed, the 'right' he seeks to vindicate does not even fully materialize until the litigation is completed and the relator prevails." *Vt. Agency of Natural Res.,* 529 U.S. at 773, 120 S. Ct. at 1862, 146 L. Ed. 2d at 845. North Carolina law comports such that as in *Dyer,* our Supreme Court stated:

> An informer has no natural right to the penalty, but only such right as is given to him by the strict letter of the statute . . . . He has in a certain sense an inchoate right when he brings his suit, . . . but he has no *vested* right to the penalty until judgment.

126 N.C. 941, 944-45, 36 S.E. 177, 178 (1900). An inchoate right is "a mere personal power or privilege, solely created by statute, reflecting the existing public policy and [is] subject to change or withdrawal at the pleasure of the Legislature at any time before its exercise." *Pinkham v. Unborn Child. of Jather Pinkham*, 227 N.C. 72, 79, 40 S.E. 2d 690, 696 (1946); *Williams v. Atlantic Coast Line R.R. Co.*, 153 N.C. 360, 364, 69 S.E. 402, 403 (1910). If judgment has not already been entered, generally, "a right created solely by the statute may be taken away by its repeal or by new legislation." *Bass v. Weinstein Mgmt. Co.,* 2021 U.S. Dist. LEXIS 169793, at *7 (M.D.N.C. Sept. 8, 2021) (unpublished) (quoting *Pinkham,* 227 N.C. at 78, 40 S.E.2d at 694). We hold Plaintiff's assertion of having vested rights to its claim, whether contractual or otherwise, fails.

Finally, Plaintiff attempts to categorize the 2018 session laws as a repealing

statute. Plaintiff cites case law to argue that its action, "having been brought before the repealing statute was enacted, is plainly not affected by it" because if the General Assembly "had meant otherwise, it would have inserted, as it always does when such is the intent, the words 'and this shall apply to pending suits.' " *City of Wilmington v. Cronly,* 122 N.C. 388, 391, 30 S.E. 9, 11 (1898). Plaintiff asserts the general rule that "[w]here the statute is simply repealed and no allusion is made to pending actions, the inchoate rights therein acquired are not interfered with, but may be prosecuted to final recovery." *Williams,* 153 N.C. at 365*,* 69 S.E. at 403 (citation omitted).

¶ 39      However, Plaintiff's argument is inapposite to the case at bar because the 2018 Amendment is not a repeal, but "an absolute and express remission of [a] penalty" that the General Assembly has the right to destroy. *Dyer*, 126 N.C. at 944, 36 S.E. at 178. Just as in *Dyer*, the enacted 2018 legislation is "an act of amnesty or pardon," *id.*, which specifically released all subscribers or communications service providers from liability "to any person or entity for billing or remitting a different number of 911 service charges" than required by the current 911 statutes. 2018 N.C. Sess. Law 97, § 10.3. While it is true that S.B. 335 does not utilize "pending" language, in *Dyer*, our Supreme Court determined that the Act's language stating that the defendants "are hereby released from any and all penalties" was specific enough to indicate "to whom and to what the act was intended to apply." *Dyer*, 126 N.C. at 944, 36 S.E. at

178. Here, the language in S.B. 335 is comparable to the Act in *Dyer*, as the provision unambiguously releases (1) all subscribers or communications service providers (to whom the act was intended to apply) from (2) any person or entity for billing or paying a different 911 service charge amount than required by the "Part 10 of Article 15 of Chapter 143B" of North Carolina's General Statutes (to what the act was intended to apply) (3) during the period for which a bill is or has been rendered at any time prior to 180 days following the enactment of this section (the relevant time period the Act's "amnesty" was intended to apply to). Therefore, we conclude that the language of S.B. 335 is unambiguous regarding "to whom and to what the act was intended to apply."

¶ 40 We further reject Plaintiff's categorization of the 2018 Amendment as "repealing" because S.B. 335 serves as a clarification of existing law. By enacting the 2018 Act to Make Technical, Clarifying, and Other Modifications to the Current Operations Appropriations Act of 2018, the General Assembly made clear its intention. In the first bill, the General Assembly expressly added that a customer "capable of making more than one simultaneous outbound 911 call . . . shall be" billed 911 charges "equal to the total number of simultaneous outbound 911 calls" that a customer can make. 2018 N.C. Sess. Law 5, § 37.4(a). In the second legislation, the General Assembly's intent is made manifest where § 10.3 states N.C. Gen. Stat. § 143B-1403(a), as amended by S.B. 99, "is intended as a clarification of existing law."

2018 N.C. Sess. Law 97, § 10.3. Thus, our General Assembly provided "further insight into the way in which the legislature intended the law to apply from its original enactment." *Ray v. N.C. Dep't of Transp.*, 366 N.C. 1, 9, 727 S.E.2d 675, 681 (2012). Therefore, as a "clarifying amendment," the language added in § 37.4(a) applies not only to "cases brought after [its] effective date[]," but also "to *all cases pending* before the courts when the amendment is adopted, regardless of whether the underlying claim arose before or after the effective date of the amendment." *Id.* (emphasis added) (citations omitted). As such, Plaintiff's arguments concerning the legislation's lack of explicit "pending" language fails.

### III.    Conclusion

After careful review of the record and applicable law, we affirm the judgment of the trial court, granting Defendants' motion to dismiss. Although the trial court erred in granting Defendants' first-to-file argument from their Joint Motion to Dismiss, because the first-to-file rule does not apply in this case, we affirm the judgment as the trial court correctly determined the 2018 Amendment to the 911 statute applies retroactively to Plaintiff's claim. Due to the retroactive application of the Amendment, we conclude the trial court correctly granted Defendants' Joint Motion to Dismiss for Failure to State a Claim.

AFFIRMED.

Judges ARROWOOD and CARPENTER concur.